1                    UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   UNITED STATES OF AMERICA,      .
                                   .
4               Plaintiff,         . No. 19-cr-2123-GPC
                     v.            .
5   BRUNO RIOS-MONTANO,            .
                                   .
6               Defendant.         .
    . . . . . . . . . . . . . . . .
7   UNITED STATES OF AMERICA,      .
                                   .
8               Plaintiff,         . No. 19-cr-3878-GPC
                     v.            . December 6, 2019
9   JOSE IVAN RAYO,                . 4:05 p.m.
                                   .
10              Defendant.         . San Diego, California
    . . . . . . . . . . . . . . . .
11
            TRANSCRIPT OF STATUS HEARING/MOTION HEARING
12          BEFORE THE HONORABLE GONZALO P. CURIEL
                 UNITED STATES DISTRICT JUDGE
13
    APPEARANCES:
14  For the Plaintiff:      United States Attorney's Office
                            By:  OWEN ROTH, ESQ.
15                               SHITAL THAKKAR, ESQ.
                            880 Front Street, Room 6293
16                          San Diego, California 92101

17  For the Defendant       Federal Defenders of San Diego, Inc.
    BRUNO RIOS-MONTANO:     By: CHLOE DILLON, ESQ.
18                          225 Broadway, Suite 900
                            San Diego, California 92101
19
    For the Defendant       Federal Defenders of San Diego, Inc.
20  JOSE IVAN RAYO:         By: LINDA ALEXANDRA McDONALD, ESQ.
                            225 Broadway, Suite 900
21                          San Diego, California 92101

22  Interpreter:            Gabriela Sosa
                            Certified Spanish Interpreter
23
    Court Reporter:         Chari L. Bowery, RPR, CRR
24                          333 West Broadway, Suite 420
                            San Diego, California 92101
25                          chari_bowery@casd.uscourts.gov
    Reported by Stenotype, Transcribed by Computer

SAN DIEGO, CALIFORNIA; DECEMBER 6, 2019; 4:05 P.M.

-o0o-

THE CLERK:  Calling matters 30 and 31 on the
calendar, 19-cr-2123, U.S.A. v. Bruno Rios-Montano, for status
hearing; and Case 19-cr-3878, U.S.A. v. Jose Ivan Rayo, for
motion hearing.

MR. ROTH:  Good afternoon, Your Honor.  Owen Roth and
Shital Thakkar on behalf of the United States.

MR. THAKKAR:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. DILLON:  Chloe Dillon, Federal Defenders, on
behalf of Mr. Rios-Montano, present before the Court, on bond.

MS. McDONALD:  Good afternoon, Your Honor.  Alex
McDonald, Federal Defenders, on behalf of Mr. Rayo.  He is not
yet present.

THE INTERPRETER:  And Gabriela Sosa, certified
Spanish interpreter.

THE COURT:  Good afternoon to everyone.

(Defendant entered the courtroom.)

THE COURT:  Let the record reflect that Mr. Rayo is
now present.

MS. McDONALD:  Your Honor, could I just have a brief
moment to speak to Mr. Rayo?

THE COURT:  Yes.

(Discussion between Defendant and counsel.)

1          MS. McDONALD:  Thank you, Your Honor.

2          THE COURT:  So, Mr. Rios, you can have a seat.  We

3    are going to be taking up a number of matters.  I will be

4    hearing from counsel.

5          So, we are here on a number of motions, and let me just

6    begin by asking both Ms. Dillon and Ms. McDonald, is it

7    acceptable to both of you to proceed on the Posse Comitatus

8    aspect of your cases in the same proceeding?

9          MS. DILLON:  Yes, Your Honor.

10          MS. McDONALD:  Yes, Your Honor.

11          THE COURT:  Is that acceptable to the government?

12          MR. ROTH:  Absolutely, Your Honor.

13          THE COURT:  So, then, with that having been said, we

14    probably have had hearings in both of these two cases, Rayo and

15    Rios, regarding the motion to suppress or dismiss, based upon

16    violations of Posse Comitatus.  The Court had requested further

17    briefing.  The Court has received further briefing from the

18    parties in both cases.

19          And the government's most recent offering is one where

20    they point to certain actions that were attempted,

21    unsuccessfully, by Congresswoman Cortez, and I would like to

22    hear what the defendants' view is with respect to what effect,

23    what import those actions have as to the respective positions

24    of the parties.

25          As offered by the government, at page 3 of their

1    supplemental response of the United States, filed on

2    November 25th, they note that the recent activity in Congress

3    reinforces their position.  In July, Congresswoman

4    Ocasio-Cortez sought to repeal the deployment authorization.

5    As noted in a recent news report, Ocasio-Cortez pushed a pair

6    of amendments to bar the Defense Department from deploying

7    troops to the southern border.

8         But, more specifically, there's a reference to the

9    congressional record, dated July 11, 2019.  Congresswoman

10   Ocasio-Cortez's amendment was, reportedly, according to the

11   government, intended to roll back the 2016 deployment

12   authorization, what is quoted here, at lines 12 through 18,

13   states, "None of the funds authorized to be appropriated or

14   otherwise made available for the Department of Defense for

15   fiscal year 2020 may be obligated or expended for any activity

16   authorized pursuant to Chapter 15 of Title 10, United States

17   Code, or Section 1059 of the National Defense Authorization

18   Act, for fiscal year 2016" -- and the law is identified as

19   Public Law 114-92, 129 Statute 986, and 10 U.S.C. Section 271,

20   note -- "if a significant purpose of the activity is to assist

21   with enforcement of any part of the Immigration and Nationality

22   Act."  The government continues that "180 members of Congress

23   sought to amend the NDAA's deployment authorization."

24        What do you make of that action, that attempt by

25   Congresswoman Ocasio-Cortez, either defense counsel?

MS. McDONALD:  Your Honor, I note a couple of things.
The first was Ms. Cortez was not one of the drafters of the
appropriations bill from 2016.  And she is not a legal scholar,
and her statements are not reflective of the law.

And oftentimes, in these congressional hearings, political
statements are being made.  If you go further into this
Congressional Record, there's a back-and-forth conversation
between Ms. Cortez and other members of Congress about the
propriety of the use of the military at all.

So the reason I think that the government has chosen to
cite this -- her language in this conversation that she is
having is because their position is not supported by the law.
The law in this district, in the Ninth Circuit, could not be
more clear about the limited scope of appropriations bills.

We have cited to *Tin Cup*, *LLC, v. United States Army Corps
of Engineers*, and that goes into precedent that has been in the
circuit for a long time.

THE COURT:  Well, but, I guess, before we get there,
I am trying to size up what does this mean?  What can one infer
from what Congresswoman Ocasio-Cortez attempted to do?

And, keeping in mind, it wasn't just her on some lark, on
some detour that she took alone; but there's reference to 180
members of Congress that were apprised of what she was
attempting to do -- and, granted, all of Congress -- all of
Congress would have been informed of what she was trying to do.

And it wasn't a situation where you had, then, the more learned scholars, if one can say there are any learned scholars on the law in Congress -- one would think they are all, because they are the ones that make the law.

But to the extent there's one specialist, somebody would have been able to say, "Congressman, what are you doing?  This law expired on its own back in 2016."  Only we don't have anything along those lines.  But, more importantly, we have this request to affect the law in 2016, and you have 180 members of Congress saying that, "Yeah.  We would like to do that."  But, at the end of the day, it didn't pass.

At a minimum, it would suggest that the majority had acquiesced in this notion that the 2016 appropriations act still carried some force into 2019.  And one could argue that it would provide some evidence and sufficient evidence to rebut the presumption that an appropriations act expires under its own terms at the end of the fiscal year.

How do you respond to that?

MS. McDONALD:  Your Honor, I think that her proposed amendment is forward-looking.  She is discussing, in this conversation with Congress, limiting the militarization of the border at all, going forward.

THE COURT:  Why does she make reference to 2016, then?  Why does she look back?

MS. McDONALD:  The 2016 NDAA authorized $75 million

1   for the assistance of the Marines at the border in 2016.

2          THE COURT:  But according to your argument, that

3   $75 million had to be spent in that particular fiscal year,

4   2016, correct?

5          MS. McDONALD:  That's -- the law says that the 2016

6   appropriation bill is no longer in effect beyond 2016.

7      But we also submitted a portion in the briefing where we

8   said, to the extent that any of that money is to be used beyond

9   2016, we were requesting discovery on whether the $75 million

10  that was originally allocated had in fact been used or if they

11  had been going beyond the specific amount that was allocated.

12  That is part of this, too.  Is she referring to the original

13  throwing of $75 million at this?

14         THE COURT:  But the only way you can get there is by

15  then, either tacitly or directly acknowledging, that yes, the

16  2016 appropriations act did have the force of the law moving

17  beyond the 2016 fiscal year, correct?

18         MS. McDONALD:  That is simply not what the law says

19  with regard to the effect of the appropriations bill, Your

20  Honor.  But to the extent that the Court feels that there is

21  something -- there's -- the Court is to be guided by

22  Ms. Cortez's statements, I think we need to look at the

23  specific funds that she is talking about, which is the original

24  amount that was the $75 million.

25         THE COURT:  I am just bringing this up because I was

not prepared to interpret this 2016 law in the way the
government was offering.

At the same time, looking at this, it seems to me that
even if one can conclude that, "Well, Congress aren't the ones
that are tasked with interpreting what they have done" -- one
would think that they have -- but, that at a minimum, what this
would show is that they have acquiesced, and that, in that way,
it would tend to rebut the strong presumption that would
otherwise apply.

And then, take one step further, that it would be salient
in determining whether or not some exclusionary rule or some
remedy, including suppression, would be appropriate, where one
can argue that the military was looking at what was being
stated by Congress, and concluded that, yes, they were
authorized to continue to involve themselves in these
surveillance activities in support of law enforcement.

So, on a number of different levels, it seems it would
provide some support for the government's ultimate argument
that, "Whatever else you do, Your Honor, suppression is not
appropriate; dismissal is not appropriate; no imposition of a
remedy would be appropriate, given what we have here."

MS. DILLON:  May I respond on behalf of Mr. Rios,
Your Honor?

THE COURT:  Yes.

MS. DILLON:  Thank you.

1     For the purpose of the record, in Mr. Rios' case -- I am

2     aware that there was a government filing in the case of

3     Mr. Rayo that contained that argument.  I don't think that

4     Mr. Thakkar's briefing in Mr. Rios's case, but we had already

5     talked about that this was the issues in the case that the

6     Court was confronting together.

7     This is the way that I read the record.  Currently, in

8     2019, Congress is considering what the fiscal -- the Department

9     of Defense fiscal year 2020 budget should be.  And I do not

10    read an amendment as being an amendment of the 2016 act.  I

11    don't think that the -- I don't think that the fiscal year

12    2019 bill, 2020 bill, is an amendment of the 2016 bill.

13    I agree with Ms. McDonald that essentially you have

14    year-by-year fiscal bills.

15    So I think, the way that I read it, an amendment is -- it

16    is an amendment to the 2019-2020 -- well, the 2020 fiscal bill

17    that's being debated in 2019.  And the purpose of that

18    amendment to the 2020 bill is to prohibit the use of funds.

19    So, Amendment 429 prohibits the use of funds for the

20    enforcement of the INA.  And Amendment 430 prohibits the use of

21    funds for providing housing for undocumented aliens.

22    So, my understanding of those amendments is that their

23    purpose is to put a prohibition on the use of certain DOD funds

24    for these purposes.

25              THE COURT:  And I agree with you that if that's all

we had -- which I believe is quoted from the "Washington Post"
article, that one could find a way to distinguish or to
otherwise reject the government's argument.

But let me ask Mr. Roth.

MR. ROTH:  Yes, Your Honor.

THE COURT:  What is found at lines 12 through 18,
from what I see here, that's from the Congressional Record; is
that right?

MR. ROTH:  Yes, Your Honor.  It was a proposed
amendment to the upcoming authorization act, for the purpose of
rolling back the authority granted by the 2016 act.

THE COURT:  And so, it specifically makes reference
to the National Defense Authorization Act for fiscal year 2016?

MR. ROTH:  And, further, Your Honor, the very
section, 1059, that is the deployment authorization, and cites
to the public law number and the stat number that is the pin
cite for the deployment authorization.

Your Honor, if I could -- I think this is a good point,
because I think we are operating under a subtle but important
misconception about the difference between appropriation bills
and authorization acts.  They are different.  They do different
things.  And the National Defense Authorization Acts, which is
the annual defense bill, does contain fiscal appropriations.
But these bills do far more than that, Your Honor.  The
National Defense Authoriziation Acts are the annual

1   authorizations to the defense department, the military, to

2   function.  They provide all kinds of levels of authority.  We

3   cite a couple of different examples in our brief.

4        The 2012 one provided the Treasury Department with a

5   sanctions program on Iran.  It also codified the procedural

6   mechanism for the United States' War on Terror, the AUMF, which

7   is a congressional act which was put into a procedural frame in

8   the 2012 NDAA that is still the law today.

9        Appropriations, Your Honor, are a significant aspect of

10  Congress's function; but it is about the allocation of funds

11  and the ability to contract and commit funds and to create

12  obligations on behalf of the United States.

13       The *Tin Cup* case is about an appropriations bill.  We are

14  happy to go through the facts and explain that.  But the NDAA

15  is quite clear:  It's authorizing the military to deploy forces

16  to the southwestern border.  And because we are talking about

17  authorization to do something and not just the funding that

18  goes towards something, that is significant.  That is how the

19  Court can infer, quite readily, that the 2016 act gave

20  authorization that is not time limited.

21       That's why it's so significant that there's more than half

22  a dozen, I believe, sections of the 2016 act that do provide

23  sunset provisions, again, for things that the military can do,

24  up to certain points in time.  By contrast, the deployment

25  authorization contains no sunset provision whatsoever, just

1   like there's no sunset provision in the 2012 NDAA on the

2   sanctions program or on the AUMF.

3          THE COURT:  So, you are saying that there are any

4   number of sunset provisions that are included in one or more of

5   these authorization --

6          MR. ROTH:  Absolutely, Your Honor.

7      In the 2016 one alone -- if the Court looked on page -- if

8   the Court refers to page 2 of the government's brief, at lines

9   18 through 20 or 21, we cite, Your Honor -- one, two, three,

10  four, five, six, seven, eight -- nine discrete sections of the

11  2016 NDAA that contain sunset provisions, and we give the Court

12  an example of one that sunsets in 2022, that particular one.

13     The deployment authorization is clear on its face.  The

14  Secretary of Defense may authorize the deployment.  There is no

15  sunset provision.

16     Now, Ms. McDonald is absolutely right.  On the law of

17  appropriations, the law in this circuit is clear.  When an

18  appropriation is made, the heavy presumption is that it's

19  appropriated for that fiscal year.

20         THE COURT:  What do you make of the -- I think it is

21  $75 million that is authorized in the NDAA that we are talking

22  about?  Is that an appropriation?

23         MR. ROTH:  It is an appropriation of $75 million for

24  the purpose of effecting the deployment for that fiscal year.

25  But to suggest that that allocation of funds controls the

1    authorization is the tail wagging the dog, Your Honor.  That's

2    our point.

3            THE COURT:  Let me ask you this.

4        To the extent there was $75 million that was appropriated,

5    and to the extent it was exhausted, it was all spent, where,

6    then, would there be a continued authorization to spend moneys

7    for these authorized activities?

8            MR. ROTH:  I am not sure, is the honest answer, Your

9    Honor.  We can check the current NDAA to see if there's an

10   omnibus provision that the Department of Defense could tap into

11   for the deployment, or if there is a specific deployment

12   provision.  I am candidly not versed today in how the funding

13   works.

14           THE COURT:  Certainly, we are talking about aspects

15   of the law which I think Judge Dembin had excitedly referenced

16   that he was going to be involved in some trailblazing of some

17   type.  But, certainly, there's a lot of issues of first

18   impression.  There's not many cases that address Posse

19   Comitatus outside of maritime law enforcement, and I think

20   everybody has acknowledged that there is not a case similar to

21   this in any district in the United States.

22       And the fact that we have a 2016 act suggests that

23   Congress acknowledged that what is happening at the border,

24   since 2016, qualifies as facts that would otherwise be

25   prohibited under Posse Comitatus.  And so, they were aiming to

1   make sure that the necessary authorizations were being

2   provided, and so they chose this NDAA of 2016 to do it, which,

3   on its face, would kind of suggest that it would have a shelf

4   life of the fiscal year.

5       But you have pointed out this, and you have also pointed

6   out, as in the case of the sanctions against Iran, that they

7   originated in the NDAA for 2012 and they are still with us and

8   so that, when it comes to these authorizations, which we don't

9   confront in our everyday experience and our legal careers,

10  here, that they are a different bird; that they are treated

11  different than, as you point out, appropriations, but different

12  than other -- than common sense itself would suggest.

13      Like I said, before reviewing your papers, I was leaning

14  towards a conclusion that, "No, it doesn't go beyond 2016."

15  But then, to have Congress acting in a way that -- if not

16  directly, tacitly acknowledges the existence, the continued

17  full force of law, then -- and then with the additional example

18  of sanctions against Iran, and at that point, it's like, "Okay.

19  I have learned something.  I have learned something."

20      Let me hear further from Ms. McDonald.

21          MS. McDONALD:  I just want to correct one thing for

22  the --

23          MR. ROTH:  If I could just have one final --

24          THE COURT:  Yes.

25          MR. ROTH:  While we are on the topic of examples,

1    Posse Comitatus itself was enacted as part of --

2           THE COURT:  I saw that.  But at this point, though,

3    it is in a statute.  As far as the Army and the other military

4    branch, but it wasn't as to the Navy and the Marines.

5           MR. ROTH:  To be sure, Your Honor.  I merely meant to

6    point out the entire premise from which the argument flows was

7    in an authorization act.  So, for many years the federal

8    government was prohibited from participating in domestic law

9    enforcement.  There's a sad history that we don't need to get

10   into.  But the point is it all came from an authorization act.

11      Appropriations and authorizations are different.  That's

12   my point.  Appropriations are found in Title 31, Section 1101,

13   and it refers specifically to funds and the ability to contract

14   and incur obligations on behalf of the government.

15          THE COURT:  Let me hear from Ms. McDonald on this.

16          MR. ROTH:  I am sorry, Your Honor.  I will stop.

17          MS. McDONALD:  Your Honor, the first sentence of the

18   2016 NDAA says, "An Act to authorize appropriations for fiscal

19   year 2016 for military activities of the Department of

20   Defense."  It is an appropriations bill by definition.  The

21   first line of this act defines itself as an appropriations

22   bill.

23          THE COURT:  But it's called an authorization act.

24          MS. McDONALD:  Right.  The purpose is to authorize

25   appropriations for the fiscal year of 2016.  That's the first

1    line of the act.

2        Mr. Roth is correct that Posse Comitatus came from an act

3    that was codified.  The Iranian sanctions he refers to have

4    been codified.  He cites 31 C.F.R. 561.

5        And the reason that some of these provisions have

6    sunset -- some of these portions of the NDAA have sunset

7    provisions is because they are required to if they are to

8    extend beyond the fiscal year of the bill in which they are

9    introduced.  That's why he cites provisions that say, "This

10   particular provision is going to be extended to 2022," because

11   without that sunset provision, it would cease to be in effect

12   past 2016, which is the law with regard to appropriations

13   bills.

14       We have cited the case law.  They have cited no case law.

15   They are standing for general propositions that -- based on a

16   statement by a Congresswoman who was not in office when this

17   was drafted.

18            THE COURT:  But still, what do you make, though, of

19   the fact that -- it is just not her.  It is not her screaming

20   out in front of the world.  It is not her at a press conference

21   providing her read of what the law is, should be.

22       She is offering something and then Congressmen and women

23   are supporting it, rejecting it.  And so no one disabused her

24   of the notion that, "I am sorry.  As a matter of procedure,

25   this is off the table because the 2016 authorization act has

1　already expired."

2　　　I join Ms. Dillon's argument.

3　　　　MS. DILLON:　I guess that I have a question.　I don't

4　think I am allowed to pose questions to the Court, so I am

5　going to pose this as a hypothetical.　I am going to pose this

6　as a hypothetical question.

7　　　Let's say, for example, that the understanding in

8　particular of Democratic members of Congress was that the 2016

9　bill was an appropriations bill; that it would expire at the

10　end of 2016; and that the military would not be able to be

11　deployed; however, the executive branch has interpreted it

12　differently and believes that it can simply continue to provide

13　military at the southern border.

14　　　So there could be two different views of what the NDAA

15　means to the political parties, essentially.

16　　　So, basically, the executive branch, the Republicans, can

17　be taking a view of this as an authorization bill; whereas,

18　perhaps, Congress believed, and certain members of Congress are

19　very frustrated that the executive branch is taking that

20　position because they believe that they never should have been

21　able to extend that appropriation past 2016.

22　　　So, in response to that frustration, they say, "Well, you

23　know, if we amend the" -- "if we put this amendment into the

24　2020 fiscal bill, that will just definitively put an end to it

25　one way or another."

1      I guess Ms. Ocasio-Cortez's position is not inconsistent

2  with the argument that it should have ended with the fiscal

3  year 2016; that this could be, in fact, even, a legal dispute

4  between parties and between the branches.

5          THE COURT:  But it doesn't sound like it's

6  inconsistent with the government's position either, does it?

7          MS. DILLON:  I think that the government's position

8  would basically be the executive and the Republican side, and

9  then ours would be sort of the Democrat, like --

10          MR. ROTH:  To be clear, the government has no policy

11  position with regard to this.

12          MS. DILLON:  No, but I am saying we are getting into

13  a realm where we are talking -- it's possible that the

14  political parties are interpreting the NDAA differently.

15      And I realize that Ms. Ocasio-Cortez then introduces an

16  amendment, that that would further her political aims of trying

17  to stop this military deployment one way or the other.

18          THE COURT:  Certainly, we can all agree that's what

19  she is trying to do.

20          MS. DILLON:  Yes.

21      So even if she believes that it should have ended at the

22  end of 2016, she can introduce this amendment because, if the

23  amendment passes, then it doesn't matter whether it ended in

24  2016 or not because it's no longer authorized now.

25          THE COURT:  But doesn't it matter when, say --

assuming your hypothetical, that if Congresswoman Ocasio-Cortez was of the view that, "You know what? I don't even know why we are doing this, why do we have to do this, because that law expired in 2016? But since those folks over there are proceeding like it never expired, let me make it perfectly clear."

And then when she attempts to make it perfectly clear, and she says, "Okay, gang. Let's make it perfectly clear."

And Congress says, "No."

Doesn't that, by itself, provide a measure of support for the notion that it is continuing?

MS. DILLON: I do agree with Ms. McDonald that I think there is two different things; that one is politically motivated by partisan politics and the other is just a pure legal question.

And so I think that whether the House votes to amend or not is a partisan political issue, and that the question is, as we -- does a court of law -- how does it interpret a law?

And I think that I agree with Ms. McDonald that, especially given the partisan nature of this discussion, probably the best thing is to just go back and look at authority.

Candidly, Your Honor, I would, I guess, ask the Court for the opportunity to address this legal issue further because I don't think I addressed it in my briefing, and look into the

1  difference between appropriations and authorization bills

2  because if that is where the Court is going, then I think that

3  that's really what we need to determine is was the NDAA an

4  appropriations bill or an authorizations bill?

5        THE COURT:  And I am prepared to do that.

6     As we see, with every round of briefing, there's something

7  that is surfacing that is salient in looking at this issue.

8     And, certainly, I don't want to get it wrong, number one;

9  and number two, I would like to prepare an order offering my

10 views on what we have here, and also an order so that to the

11 extent that this goes up before the Ninth Circuit, then the

12 Ninth Circuit has as fully developed of a record as we can

13 provide the Ninth Circuit.  And then they can land on one side

14 or the other based upon a complete record as far as briefing,

15 and then, to the extent necessary, a factual record.

16    Because, certainly, if one were to conclude that the NDAA

17 for 2016 doesn't provide this extended authorization beyond

18 2016, then the next question becomes, "All right.  Well, what

19 now?  Should the Court invoke some sort of remedial measure?"

20    And, in making that determination, I think what we have

21 now in the record is not complete.  I think we would need to

22 fortify, we would need to round out our record in order to cue

23 this up in proper fashion.

24    Does anybody else wish to be heard on any part of this

25 right now?

1          MR. ROTH:  Your Honor, just to make a short record,

2     our purpose in offering the Court the anecdotal proposed

3     amendment by the Congresswoman was to just demonstrate that, at

4     least in the view of Congress, it felt it had to amend the NDAA

5     if it was going to roll back the authorization.

6          Now, we say that because I want to be clear; it is the

7     Court's decision.  Right?  What a Congressperson proposed, what

8     a minority of Congress voted on -- if the majority voted for it

9     and the President signed it, then the Court would be bound by

10    it.

11         But this is meant to show, at least in the view of the

12    folks who, as a body, enacted the law, more legislation is

13    required.

14         In our view, the most persuasive points are the fact that

15    there are multiple examples throughout the U.S. Code, or rather

16    the books, of NDAAs containing freestanding, non-time-limited

17    provisions of law; that there are multiple sunset provisions in

18    the 2016 NDAA itself, but not in this particular provision; the

19    fact that it is recorded in the U.S. Code as a Note to

20    Title 10, which the Court had that question for us the first

21    time we argued this issue.  And it is not in Title 10 itself,

22    but it is in a note.

23         And as we provided the Court an example, the entire

24    post-9/11 civil litigation program is a note, so that doesn't

25    mean it is less significant so that it is a limited provision

1   of law.

2       Those are really the points.  Every single textual point

3   that Court could look to in the books points out the

4   proposition that this is not limited to the fiscal year 2016.

5   Monies specifically appropriated for it in that year, sure.

6   That makes perfect sense.  That's what *Tin Cup* says.  That is

7   what the Title 31 provision says.  And that's a basic feature

8   on congressional funding; you have to allocate money every

9   year.  But the authorization is different, as demonstrated by

10  the text.  That is really our point.

11          THE COURT:  Is it your view that you could have an

12  authorization which then contains these appropriations which

13  would be carved out in terms of giving them away as law moving

14  forward?

15          MR. ROTH:  You could have an authorization that is a

16  force of law, freestanding, separate from a

17  particular appropriation to fund the activity.

18          THE COURT:  So, here, Ms. McDonald pointed to the

19  beginning language of the NDAA for 2016 and read where it

20  begins by acknowledging that this is an appropriations -- and,

21  certainly, I would expect that an authorization can include

22  within it appropriations.

23      So, to the extent that it includes appropriations, does

24  that, then, turn it into nothing but an appropriations?  Or do

25  we have these kind of hybrids?  Or is it that, if an

1    appropriations is part of an authorization, then it ends up

2    getting swallowed up in this authorization and it is treated in

3    a fashion differently?

4           MR. ROTH:  Your Honor, I think a good analogy is it

5    is part car, and it is part gasoline.

6        The Defense Department can't do anything without authority

7    form Congress.  And in various NDAAs, Congress lays out what

8    the Defense Department may do.  Congress then has to fund it

9    because the Defense Department has no freestanding authority to

10   just spend money.  They might have -- I don't mean this

11   pejoratively, but they might have some kind of slush fund and

12   ability to move their money around, but Congress has to

13   allocate the funds.

14   My point is this:  Once the car is given to the Defense

15   Department and then the NDAA, it exists and can be driven

16   around until Congress takes it back.  Congress has to provide

17   the gas every year.  It has to fund the particular thing, and

18   if there's no money, then effectively the Defense Department

19   couldn't do that particular thing, they couldn't drive that

20   particular car, but they would still be in possession of that.

21       And we see this all the time.  The Justice Department has

22   the authority to prosecute marijuana cases, but as the Court

23   surely knows, there's an amendment to the DOJ funding bill that

24   prohibits us from spending any money to prosecute marijuana

25   cases for medicinal marijuana dispensaries.

1          THE COURT:  I did not know that.

2          MR. ROTH:  The authority exists.  It used to be

3   called the Rohrabacher Amendment.  The authority is on the

4   books.  We can prosecute Title 21 cases all we want, but we are

5   not allowed to spend any money to prosecute people who have

6   dispensaries.  So, zero dollars were allocated, but we have

7   that authority.  This is not an uncommon feature of allocations

8   of authorizations -- cars -- and funding to pursue those

9   authorizations, the gas.

10         Now, I cannot stand here today and tell you precisely

11  where the money from 2016 to fund the deployment has come from.

12  I don't know if Congress gave a general authorization and gave

13  the Defense Department some discretion.  Of course, we will

14  look into it if the Court prefers that.

15         But our point is this:  Allowing the DOD to do something

16  and giving them money to do it are separate features of the

17  act.

18         And if you look at the contents of the NDAA, not just the

19  very first sentence of it, the Court will see a myriad of

20  things that Congress is authorizing the DoD to do:

21  Procurement, staffing, deployment, technological developments.

22  I think they created CyberCom in the last years, which is a

23  whole separate command.

24         All of these things come from authorizations that then, of

25  course, have to be funded, but they are distinct.

1          MS. DILLON:  I have one question, then, which is why

2    wasn't this provision codified as law?

3        If the authority for the DOJ, for example, to prosecute

4    drug crimes is 21 U.S.C. 841, 951, et seq., then why isn't

5    there a codification provision of law if this is an

6    authorization?  If this is an authorization that becomes law,

7    then why isn't this codified?

8          MR. ROTH:  It is.  It is a note in Title 10.  So if

9    the Court went to the U.S. Code, you would see pages of notes.

10          THE COURT:  And I do recall, on occasion, I have seen

11   this pronouncement of law, where it is not in a statute, and

12   when you are looking it up in Westlaw, it is not given its own

13   U.S.C. Section, which always has been odd to me.

14          MR. ROTH:  It is an editorial judgment by a permanent

15   sort of body within Congress.  We cite the name of it in our

16   brief.  And I am happy to provide that to defense counsel.

17       But Congress has an editor, and the editorial body decides

18   what will be codified in particular provisions of U.S. Code,

19   10 U.S.C. 1, 2, 3; what will be a note; what will be left in

20   public law that goes into the books.  And they do it based on

21   various factors that they have set up, and they have been doing

22   it for decades.

23          MS. McDONALD:  Your Honor, I would add if Mr. Roth is

24   correct and the 2016 NDAA authorized the use of the military

25   indefinitely but limited funds, if they are using funds outside

1    of what is allocated, that is a violation of the authorization

2    that was given in 2016.  Just like if the U.S. Attorney's

3    office started prosecuting marijuana cases using funds that

4    were not to be allocated for that, that would be a violation of

5    that authority, and thus, a violation of the Posse Comitatus

6    Act, if those funds were being used without permission.  And

7    that's the discovery that we are seeking in this case.

8              THE COURT:  At this time, let me ask defense counsel

9    to respond to the government's supplemental response.

10         I know that there was a reply, there was a supplemental

11   briefing or reply to the government's response; but it doesn't,

12   really, head-on address these arguments relating to the actions

13   of Congresswoman Ocasio-Cortez and how they would either

14   constitute a recognition of what the current law is or whether

15   or not what happened earlier this year would constitute a

16   reflection of Congress's acquiescence in the continued use of

17   military resources for enforcement of any part of the

18   Immigration Nationality Act and whether or not there's anything

19   about these actions that would properly be considered to rebut

20   the presumption that is otherwise found in the law and as

21   recognized in *Tin Cup*.

22         And, then, whether or not any of this would bear on some

23   type of good-faith exception or argument that could be used to

24   convince the Court that it should not impose any remedial

25   measures if it finds that there's a violation of the Posse

1   Comitatus Act.  I think that's what I would be looking for.

2   And then anything else that you may have that bears on

3   statutory interpretation.

4       And the effect of these notes that are not actually

5   referred to by statutory number and whether those are properly

6   afforded the weight of the law.  So I would like to hear more

7   about this from the defense side.

8           MS. DILLON:  That's very helpful, Your Honor.  I

9   think I have managed to scribble down the Court's questions,

10  and we would appreciate the opportunity to brief the response

11  to you.

12          THE COURT:  How much time would you like?  I know it

13  is the holidays.

14          MS. DILLON:  Yes, I mean, if I could discuss it.

15          THE COURT:  Sure.

16      (Counsel confer.)

17          MR. ROTH:  And, Your Honor, appreciating the

18  potential to be dispositive, we do have a defendant in

19  custody --

20          MS. DILLON:  That's what we are --

21          MR. ROTH:  -- and the government would not object to

22  doing these on two tracks.  We can set a trial schedule with

23  briefing.  We can brief this.  Sometimes this happens in

24  1326(d) motions, where the Court resolves it after trial.

25      In the interest of efficient resolution that gets Mr. Rayo

1  his day in court, if the parties -- if the defense and the

2  Court want to set a trial date and *in limine* date so the

3  defendant is not sitting around waiting for us to resolve this

4  until March or April, the government has no objection.

5      And I don't waive any arguments about things that are

6  being presented.

7          MS. McDONALD:  Your Honor, I think what might help

8  the circumstance is potentially addressing a bond modification

9  with the Court.  The bond was set in this case.  It is a

10  $10,000 personal appearance bond.  The thing that has been

11  keeping him in custody is the $2,000 deposit, because his

12  family is low income but he's had ties to the community for his

13  entire life.

14      (Counsel confer.)

15          MR. ROTH:  Our view is the Bail Reform Act stands on

16  its own.  We are certainly happy to go back before Your Honor

17  or the magistrate judge to talk about whether there are

18  conditions set that could be under the act.

19      What I meant to say is we do not mean just because we go

20  to trial that the defense will waive anything with respect to

21  Posse Comitatus.

22          THE COURT:  So Mr. Rios is on bail, and his maximum

23  trial date as of this moment would have been December 26, but I

24  expect he is not complaining or doesn't have a problem if we

25  were deliberate about having further briefing offered.

1     MS. DILLON:  For Mr. Rios, no.  I believe all of this

2  is in the interest of justice for him because this is an

3  argument that he is bringing, so we would respectfully agree

4  that time should be excluded because the motions are pending

5  and the Court is considering his motions.

6     THE COURT:  As to Mr. Rayo, has maximum trial date at

7  this time is January 28th.  And you noted that his bond has

8  been set at $10,000?  $2,000?

9     MS. McDONALD:  $10,000 with two financially

10  responsible adults.  The issue is the $2,000 deposit.  My

11  client's family, they all live here in San Diego and are

12  willing to serve as sureties.  And they have been able to come

13  up with a couple hundred dollars, but I do think otherwise,

14  they could meet that requirement.  So if the Court would be

15  inclined to lift the deposit, I am sure he would love to

16  litigate this from sitting next to me here, coming in through

17  the other door.

18     THE COURT:  What is his exposure in this case?

19     MS. McDONALD:  It is getting close to the guidelines,

20  Your Honor.

21     MR. ROTH:  These are not high guidelines cases, Your

22  Honor.

23     I apologize, Your Honor.

24     It's probably like 15 to 21 months, after trial, without

25  acceptance, before the Court considers 3553(a).  We assess he

would be in level 16, in a criminal history category III, after a trial.

        THE COURT:  Do you agree?

        MS. McDONALD:  I do, Your Honor.

    But, Your Honor, Mr. Rayo -- he went to middle school, high school here.  His entire familiar lives in the community. And they are willing to -- they submitted the bond paperwork. We have just been struggling with the deposit.

    The Bail Project, a nonprofit organization that our office works with, is certainly willing to pay the $2,000 deposit. They help provide transportation and other assistance to our clients.  And if the Court would allow the $2,000 to be paid by The Bail Project, we could get this accomplished very quickly, I think.

        THE COURT:  Normally, I am not a fan of The Bail Project --

        MR. ROTH:  Let's take this to the magistrate.

        THE COURT:  -- just because I think unless a family has skin in the game, that it is not confidence-inspiring; it doesn't lead me to conclude that the cash deposit will operate to ensure a defendants' appearance.

    I think a large number of the failures to appear -- I don't know this, but I would think that a large number of the failures to appear have been cases where The Bond Project ended up offering the moneys, versus individual family members.  Even

1    if I am wrong on that, my instinct tells me that, you know,

2    there should be some family contribution.  Maybe it doesn't

3    have to be $2,000.

4              MS. McDONALD:  Your Honor, with the personal

5    appearance bond, if Mr. Rayo would fail to appear, they would

6    be liable for $10,000.  So I do think they have skin in the

7    game.

8              THE COURT:  Well, and I do understand that it can be

9    extremely difficult to collect more than a very small part of

10   that surety, and that the administrative expenses that are

11   required to even collect a small portion of that money ends

12   up -- if not dwarfing the amount of bail, coming close.

13        Do any of these proposed sureties -- are they gainfully

14   employed and have property where one can point to their ability

15   to meet a personal surety in the event the defendant fails to

16   appear?

17             MS. McDONALD:  I don't believe they have substantial

18   assets in terms of property ownership, but his sister is

19   willing to be a surety.  She was working part-time.  She is

20   also a mother.  She has children she cares for so she doesn't

21   work full time.  His common-law wife would also be willing to

22   serve as a surety in this case.  And he does have extended

23   family as well that would be willing to serve as sureties.

24   They have been struggling to come up with the deposit, so we

25   haven't gotten to that stage.

1          THE COURT:  At this point, given the estimated

2    advisory guideline range, I don't think we are bumping up to a

3    time frame where Mr. Rayo would have served a sentence that is

4    anywhere close.  Looks like he was arrested in September, so it

5    looks like he has been in custody about three months.  I expect

6    that we will try the case by February or March, and at that

7    point, he will have been in custody for five or six months.  To

8    the extent that we do, if he is convicted, and if we have a

9    presentence investigation report, we will be able to have him

10   sentenced within eight or nine months from his arrest.

11       I was concerned that perhaps we had an individual who was

12   looking at three months in custody, and if that was the case, I

13   probably would take a different tack.

14       But as of this moment, I am not going to go further into

15   the bail.  But if you are able to come forward with something

16   more, I will be happy to consider it.

17          MS. McDONALD:  I think I will do that, Your Honor.  I

18   will put together a bond packet and submit it to the AUSA's

19   office for review and schedule it before Your Honor, if we are

20   able to come up with any sort of funds.

21          THE COURT:  So, going back to our schedule, how much

22   time are you asking for the defense side?

23          MS. DILLON:  I assume that the Court would also like

24   to build in some time for the government to have the option of

25   replying to our --

1          THE COURT:  Yeah, sure.

2          MR. ROTH:  Your Honor, I think that the government

3    will file briefing affirmatively, if the Court permits, on

4    authorizations versus appropriations.  We have done our level

5    best today, but certainly some briefing would be useful for the

6    Court.

7          We can also attempt to figure out where funding is coming

8    from these days, give the Court a sense of precisely how this

9    is all --

10          THE COURT:  Just to let you know -- and you may want

11    to start working this up -- if we went to the next level -- and

12    we may end up there anyway just for the Ninth Circuit's sake --

13    I would want to know precisely what was set in motion after the

14    military announced that it was prepared to mobilize the

15    military in 2018.  Were there actions where, as a result, there

16    was 1,000 military units that were sent to the border?  And of

17    the 1,000, that 900 were designated for surveillance, either

18    aerial or land, that would be provided through 24/7 support?

19          And, based upon that level of support, what are the

20    numbers as to how many undocumented individuals have been

21    apprehended?  How many have been prosecuted?

22          And I think that would help round out the record on the

23    question of whether or not the actions that allegedly offend

24    Posse Comitatus are sufficiently widespread so as to warrant

25    some type of remedial measure.

1          MR. ROTH:  Yes, Your Honor.  We will get to work on

2     those.

3          THE COURT:  Anything else?

4          MS. McDONALD:  On the scheduling, did the Court have

5     a date in mind for the briefing and also when the government

6     should disclose that information?

7          THE COURT:  What is your request?

8          MS. McDONALD:  I am out of town --

9          MR. ROTH:  Your Honor, would the Court accept

10    cross-briefing?  Because we do want to look into these things

11    for the Court.

12         THE COURT:  You would both file additional briefing

13    at the same time, and then reply to each other?

14         MR. ROTH:  Yes.

15         THE COURT:  That's fine.

16         MS. McDONALD:  Would the Court consider ordering our

17    briefing due the week of January 6?

18         THE COURT:  Yes.  So both sides will be able to offer

19    their next round of briefing on or before January 6, 2020.  And

20    then you can reply by January 20, 2020.  And then we will hold

21    a hearing here on February 7 at 3:00 p.m.

22         MR. ROTH:  Your Honor, we have had a good, long

23    hearing.

24      There is a second issue.  Ms. McDonald has filed

25    supplemental briefing on the request for evidentiary hearing on

1    the request for statements --

2              THE COURT:  Yes, and I saw that.  And her request was

3    on the 3501 voluntariness.  And I think she is right.

4         Is there a video regarding this aspect?

5              MR. ROTH:  No, Your Honor, because it is in the

6    field.

7              THE COURT:  Okay.  So I would think that, at some

8    point before trial, they would be entitled to some type of

9    hearing regarding voluntariness.

10             MR. ROTH:  Well, our position remains that the

11   declaration is a predicate to that.  Certainly, it is the

12   government's burden to prove voluntariness, but there has to be

13   a prima facie showing that some material issue of fact going to

14   voluntariness exists.

15        As far as the record facts are concerned at this point,

16   the only thing that exists is the discovery, and the discovery

17   doesn't point to any particular issue.

18        If Mr. Rayo is claiming that he felt undue pressure, if

19   the agent's representations are inaccurate, he has got to put

20   them forward into the record in a competent way, per the

21   Court's rules, and expose himself to cross-examination.

22        At such hearing, it is the government's burden, and

23   Mr. Rayo would have to testify, and the agent will have to

24   testify, and if we don't meet our burden, it is suppressed.

25   But it could not be the rule, Your Honor, that in the southern

1   district, in an immigration case, every case gets a hearing of

2   the agents just because they ask for it.  There has got to be a

3   prima facie showing of fact to prompt a hearing.

4           THE COURT:  We will take this up before trial --

5           MR. ROTH:  Okay.  Thank you, Your Honor.

6           THE COURT:  -- but not today.

7           MS. McDONALD:  Okay.  Briefly, Your Honor, is the

8   Court ordering a deadline for which the government should turn

9   over the information?  Because I think that might be relevant

10  to our briefing on January 6, the extent the --

11          MR. ROTH:  We don't believe we have been ordered to

12  produce anything.  We are going to research questions the Court

13  has suggested and file them in a brief, but we did not hear the

14  Court order us to produce any discovery today.

15          MS. DILLON:  I just foresee us having to do many more

16  rounds of briefing.  And I think the Court made clear the

17  extent of the use of the military is factually necessary to

18  make a complete record for the Ninth Circuit.

19          MR. ROTH:  Which is different from being ordered to

20  produce it to the defense counsel, Your Honor.

21      To be candid, this is going to be an extraordinary lift.

22  We don't think that Mr. Rayo has shown an entitlement to it.

23  He has discovery rights.  We are going to provide it to the

24  Court to enable the Court to make a learned decision, but

25  that's quite different.

1          THE COURT:  I am sorry.  You are suggesting that you

2     would obtain this information, but then provide it to the Court

3     versus defense counsel?

4          MR. ROTH:  We are certainly going to do everything we

5     can to find this information and provide it to the Court,

6     because we are officers of the Court, and the Court has

7     suggested that it finds the information relevant and helpful.

8     That's enough for us to do the work for the Court.

9       Mr. Rayo -- we have discovery obligations, and then there

10    are obligations of professional courtesy.

11      That is a massive lift.  We do not think the obligation --

12         THE COURT:  Let me ask you, in terms of the massive

13    lift, what would be the massive lift and what do you think it

14    would look like?

15         MR. ROTH:  We have to go back to DoD.  We have to get

16    somebody at DoD to help us crunch numbers to figure out the

17    number of Marines that have been stationed at the southwestern

18    border.  We have to figure out the number of times they have

19    participated in an apprehension.  And we have to figure out

20    what happened in the apprehension.

21      That's a lot, Your Honor.  And the point is this --

22         THE COURT:  I guess it would be a lot depending on

23    how the military counts, how they track these sorts of

24    activities.

25      If they don't, and there is kind of this room where

1    reports are scribbled, and then you have to go into the room

2    and you kind of have to go through thousands of pages to arrive

3    at the relevant requested reports, that's one thing.

4        If all of this is, you know, entered into computer systems

5    which then keep track, which one might think would be

6    beneficial for the military, because the military, wanting to

7    receive continued funding, would be able to point to the

8    metrics as far as what they have been able to accomplish.

9        That's why I am asking, what is the massive lift?

10       It sounds like it could be a massive lift or it could be

11   easier.

12           MR. ROTH:  That's fine.  It could be, Your Honor.  I

13   am candidly anticipating it's going to be the --

14           THE COURT:  Let's do this --

15           MR. ROTH:  Your Honor, I don't mean to malign defense

16   counsel for doing their job, but to impose an obligation on us

17   is to give defense counsel something to hold over the

18   government if we are not able to come up with it in a

19   fashion --

20           THE COURT:  I get that.  Right.

21       At the same time, I am just trying to make my way through

22   this and identify what protocol, what process makes the most

23   sense.

24       So what I will ask you to do, as a starting point, is to

25   look into this and determine is it a massive lift, or is it

1    just punching a button?

2            MR. ROTH:  Yes.  Of course.

3            THE COURT:  And then, depending upon what it is, I

4    think, as everyone knows, the Court formulates its decisions

5    based upon what is the expense, what is the difficulty in

6    arriving at this, versus what it lends to the proceedings, what

7    it lends to the administration of justice.

8        So, before I order you to provide it at a date certain,

9    let me ask you to get that in a different way and, as a

10   starting point, determine what all is involved.  Is it a

11   massive lift or not?

12           MR. ROTH:  Absolutely.

13           THE COURT:  And then we can have just a little status

14   hearing on the 20th, and you can let us know what you have

15   learned at that point.

16           MR. ROTH:  Absolutely, Your Honor.

17           THE COURT:  So we will set it for 11:30 on the 20th.

18           MR. THAKKAR:  Your Honor, I have a question about

19   Mr. Rios-Montano's record.

20       I thought Your Honor was pretty clear on the last court

21   date on that matter that you would ask for the supplemental

22   briefing on Mr. Roth's matter, and that you would consider that

23   in ruling in this case.  I may have misheard, but I thought

24   counsel had mentioned that there was no filing on this

25   particular case, but I think that's -- that was an unfair

1    representation of what the Court indicated it would do last

2    time.

3        So I just wanted to ask if, either through a minute order,

4    or I could file -- keep the same filing on both cases, but if

5    Your Honor is going to consider the filings on that matter,

6    then it -- just a comment in the minute order reflecting that

7    you are considering those filings.  Or I could just file the

8    same things on this case.  But I thought the Court was pretty

9    clear last time.

10            THE COURT:  We can have -- I am not sure if it is a

11   joinder, but we can have the record reflect that I do view

12   these two cases as presenting the identical issue with respect

13   to Posse Comitatus.  That is why I have set them at the exact

14   same time.  That is why today I ended up hearing them at the

15   same time, why we have both defendants in both cases present,

16   both defense counsel, both prosecutors.  So, what is filed in

17   19-cr-3878 will be considered in the 19-cr-2123 case.

18        So, at this point, with respect to these additional

19   pleadings, though, you can file them in each, and you can put

20   both case numbers.  I am not sure if that will freak out our

21   clerk's office.

22        Will it?

23            THE CLERK:  No.

24            MS. DILLON:  I think I am going to continue to file

25   in my individual case.  It will just make a cleaner record.  At

1    this point, we don't really know whether Mr. Rayo or Mr. Rios

2    will be appealing, or neither or both.  So I am going to --

3          MR. ROTH:  We will file everything in both cases,

4    Your Honor, just to keep it clean.

5          THE COURT:  That probably makes sense.  That's fine.

6    Okay.

7       So, then, that will conclude this proceeding, Mr. Rayo.

8       And turning to Mr. Rios --

9       (Discussion between clerk and Court.)

10          THE COURT:  Mr. Rios, you are directed to return to

11   this courtroom on February 7th at 3:00 p.m.  Do you understand?

12          THE DEFENDANT:  Yes.

13          THE COURT:  And the Court will find excludable time

14   between now and then under 3161(h)(1)(D), the pending motions

15   relating to Posse Comitatus and the other motions that are also

16   on the record and have not been ruled on.

17          MR. ROTH:  We are -- is time excluded in light of

18   motions?

19          THE COURT:  That is what I just said.

20          MR. ROTH:  I am sorry.  I didn't --

21          MS. DILLON:  So, the next date is December 20 at

22   11:30 for status?

23          THE COURT:  Yes.  But to the extent that briefing

24   will carry us to the February 7 hearing, time is excludable

25   between now and then based upon that pending motion.

1          MS. DILLON:  And you would like Mr. Rios present at

2    both hearings, Your Honor; is that correct?

3          THE COURT:  Oh, yes.  To the extent that I did not

4    mention it, you also are directed to be present here on

5    December 20 at 3:00 p.m.  Do you understand that?

6          THE DEFENDANT:  The 20th?

7          THE COURT:  Yes.  December 20.  All right, sir?

8          THE DEFENDANT:  Yes.

9          THE COURT:  That will be all.

10         MR. ROTH:  Thank you, Your Honor.

11         MS. McDONALD:  Thank you very much, Your Honor.

12         MS. DILLON:  Thank you, Your Honor.

13      (End of proceedings at 5:13 p.m.)

14                              -o0o-

15

16

17

18

19

20

21

22

23

24

25

C-E-R-T-I-F-I-C-A-T-I-O-N

        I hereby certify that I am a duly appointed, qualified and acting official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with rules and requirements of the United States Judicial Conference.

        DATED:  December 17, 2019, at San Diego, California.


                        /s/  Chari L. Bowery
                        _____
                        Chari L. Bowery
                        CSR No. 9944, RPR, CRR