**CHLOE S. DILLON**
California State Bar No. 273748
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Chloe_Dillon@fd.org

Attorneys for Defendant
BRUNO RIOS-MONTANO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRUNO RIOS-MONTANO,<br><br>Defendant. | CASE NO.: 19CR2123-GPC<br><br>Hon. Gonzalo P. Curiel<br>Date: September 24, 2020<br>Time: 1:00 p.m.<br><br>**Reply to Motion to Dismiss the Superseding Indictment Because § 1325 Violates Equal Protection Under *Arlington Heights*** |

## INTRODUCTION

In its response to Mr. Rios-Montano's motion to dismiss the superseding indictment, the government never disputes that discrimination was a "motivating factor" in Congress's criminalization of illegal entry. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Nor does it show that Congress would have passed the Undesirable Aliens Act of 1929 "even had the impermissible purpose not been considered." *Id.* at 270 n.21. Indeed, the government makes no attempt to condemn or even acknowledge the voluminous record of racist statements by legislative and executive officials underlying the illegal entry law—just a few of which were that Congress wished to keep the "rat

men" out of the American gene pool;[1] "protect[] [the] American racial stock from further degradation or change through mongrelization";[2] avoid "poisoning the American citizen";[3] and keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico."[4]

Instead of grappling with this troubling history, the government claims that any racial intent motivating the criminalization of illegal entry is irrelevant, positing four basic arguments. Because none of these arguments is persuasive, the Court should find that § 1325 violates equal protection under *Arlington Heights*, or at least hold an evidentiary hearing to determine whether Congress would have passed the 1929 law without this discriminatory intent.

**1) Attempted illegal entry is inseparable from the substantive discriminatory offense.**

The government first argues that illegal entry's racist origins are irrelevant to attempted illegal entry because Congress did not add attempt liability to § 1325 until 1990. Resp. 4–5. This argument fails because there is no attempted illegal entry without the underlying—and discriminatory—substantive offense.

Attempt liability is always inextricably intertwined with the substantive offense being attempted. It is, by definition, nothing more than the intent to commit *some other offense* coupled with a substantial step toward committing *that other offense*. *See, e.g.*, *Bunty Ngaeth v. Mukasey*, 545 F.3d 796, 801 (9th Cir. 2008) (adopting that generic definition for purposes of the categorical approach); *United States v. Morales-Perez*, 467 F.3d 1219, 1222 (9th Cir. 2006) (same, in sentencing

---

[1] Hans P. Vought, *The Bully Pulpit*, 174–75 (2004) (statement of Secretary of Labor James Davis).
[2] Exhibit E, Cong. Rec. at 121–22 (statement of Representative Box).
[3] Exhibit C at 104 (statement of Representative Fitzgerald).
[4] Exhibit G, 69 Cong. 69 at 155 (statement by constituent with which Representative Box and Commissioner General of Immigration agreed).

context); *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1192 (9th Cir. 2000) (collecting authorities for that definition); *United States v. Yossunthorn*, 167 F.3d 1267, 1272 (9th Cir. 1999) (finding no substantial step where the defendant had not "committed all the steps necessary on his part to the completion of the substantive offense"). As LaFave explains, "The crime of attempt does not exist in the abstract, but rather exists only in relation to other offenses." Wayne R. LaFave, *Intent to commit a crime*, 2 Subst. Crim. L. § 11.3(a) (3d ed.).

So close is the relationship between attempt and the completed offense that Federal Rule of Criminal Procedure 31(c) permits a jury to convict on an attempt crime even if the indictment charges only a completed offense. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 110 n. 7 (2007). Writing in dissent in *Resendiz-Ponce*, Justice Scalia summarized that point of agreement between himself and the majority: "[A]ttempt . . . is a parasitic crime. There is no such crime as bald attempt; it must be attempt *to commit some other crime.*" *Id.* at 115 (Scalia, J., dissenting) (emphasis original). This is unquestionably true," he concluded, "fully as true as the fact that attempt begins with an 'a.'" *Id.* That is why "legal impossibility" is a defense to an attempt charge, since an attempt is criminal only if the act attempted is itself a crime. *See* LaFave, *supra*, *Legal Impossibility*, § 11.5(a)(3). Because attempted illegal entry is inseparable from the original illegal reentry law passed in 1929, it carries the same discriminatory purpose.

### 2) Illegal entry is a criminal law not subject to the same "deferential, rational-basis review" as an immigration law.

Next, the government argues that the legal framework of *Arlington Heights* does not apply because § 1325 is an "immigration law" subject to "deferential, rational-basis review." Resp 5. The government's general premise is that, no matter how odious, flagrant, or despicable the racism underlying a law, courts may not

consider it because immigration laws passed by Congress are subject to weak or nonexistent judicial review.

But even assuming this disturbing approach is true for immigration laws, it is not true for crimes. Over a century ago in *Wong Wing v. United States*, 163 U.S. 228, 237 (1896), the Supreme Court held that Congress's plenary power in enacting the Chinese Exclusion Act did not authorize prosecuting noncitizens for immigration-related crimes without granting them the same Fifth and Sixth Amendment rights afforded other defendants. It has applied the same rule ever since. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (recognizing that "government detention violates [the Due Process Clause] unless the detention is ordered in a criminal proceeding with adequate procedural protections"); *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1042 (1984) (recognizing additional protections in the criminal context); *United States v. Mendoza-Lopez*, 481 U.S. 828, 837-38 (1987) (same). And the Ninth Circuit recently confirmed that courts give no deference to "dual use" statutes that apply in both criminal and immigration proceedings—let alone statutes that are purely criminal. *See Valenzuela Gallardo v. Barr*, __ F.3d __, No. 18-72593, 2020 WL 4519085, at *5 (9th Cir. Aug. 6, 2020).

The government nevertheless relies heavily on *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998), to argue that illegal entry and reentry fall "within the ambit of Congress's sweeping power over immigration matters." Resp. 9 (quotations omitted). But *Hernandez-Guerrero* only repeats what *Wong Wing* said a hundred years ago—that Congress has the *authority* to criminalize illegal entry in the first place. *See Wong Wing*, 163 U.S. at 235; *Hernandez-Guerrero*, 147 F.3d at 1077 (explaining *Wong Wing*'s ruling to that effect). This is a far cry from the government's theory—that Congress's plenary power over immigration may insulate a racially-motivated criminal law from an equal protection challenge. In fact, *Wong Wing* explicitly distinguished civil and

criminal laws, noting that conduct "punishable by deprivation of liberty and property" under criminal law must be subject to constitutional guarantees afforded to criminal defendants. *Id.* at 237. *See also Plyler v. Doe,* 457 U.S. 202, 210 (1982) (recognizing that, despite the executive and legislative branch's "broad authority over both naturalization and foreign affairs," the Fifth Amendment protects unlawfully present individuals from "invidious discrimination by the Federal Government").

Put simply, where criminal penalties begin, weak judicial review over immigration legislation ends. As another example, the Supreme Court in *United States v. Mendoza-Lopez* acknowledged that neither the text nor the legislative history of the illegal reentry statute at 8 U.S.C. § 1326 required that a noncitizen's prior deportation order be lawful in order to convict. 481 U.S. 828, 834–37 (1987). Yet this did not "end [the] inquiry" because a statute that "impose[s] a criminal penalty for reentry after *any* deportation . . . does not comport with the constitutional requirement of due process." *Id.* at 837 (emphasis in original). *See also United States v. Barajas-Alvarado*, 655 F.3d 1077, 1087 (9th Cir. 2011) (following "exactly the approach" taken by *Mendoza–Lopez* to strike down a law prohibiting judicial review of an expedited removal order in a § 1326 proceeding). These cases confirm that even when Congress has tried to cut off constitutional protections for noncitizens in criminal proceedings, courts have refused to allow it to do so.

The government also claims that Congress's plenary power over immigration renders *Arlington Heights* "inapplicable." Resp. 11. But the government elsewhere relies on a recent Supreme Court case where five Justices agreed that the framework of *Arlington Heights* applied to the Deferred Action for Childhood Arrivals program known as "DACA." *See* Resp. 10, 14 (citing *Department of Homeland Security v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020)). Because the DACA case involved an executive immigration decision, the government is careful

to say that Mr. Rios-Montano cites no case applying *Arlington Heights* to immigration laws "passed by Congress." Resp. 11. But the government also cites numerous cases applying rational basis to immigration decisions from both "political branches"—i.e., the executive *and* the legislative. *See* Resp. 6–7. So if both political branches have the same broad discretion over immigration, and the Supreme Court applies *Arlington Heights* to immigration rules from the executive, there is no reason it would not also apply to immigration laws "passed by Congress."

The government also disputes that *Arlington Heights* applies because "ordinary rational basis review is the appropriate standard in the immigration context." Resp. 7–8. To begin, the government misunderstands the type of equal protection challenge at play here. A lower standard of review may be appropriate for some classes of people where a law discriminates on its face or authorities apply a neutral law in a discriminatory way. *See Loving v. Virginia*, 388 U.S. 1 (1967); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). But where a decisionmaker enacts a facially neutral law with a discriminatory purpose, that law violates equal protection if it continues to fulfill the original discriminatory enactors' purpose—regardless of the level of scrutiny. *See Arlington Heights*, 429 U.S. at 265–66. Indeed, the plurality in *Regents* applied *Arlington Heights* to an immigration decision with no mention of rational basis whatsoever. 140 S. Ct. at 1915–16.

And at a minimum, *Arlington Heights* "supplies the proper analysis" when "both impermissible racial motivation and racially discriminatory impact are demonstrated." *Hunter v. Underwood*, 471 U.S. 222, 232 (1985). Within the past several years, multiple district court judges have applied *Arlington Heights* to immigration provisions that raise racial discrimination claims. For instance, in *California v. U.S. Department of Homeland Security*, a district court judge applied *Arlington Heights* to a rule regarding whether an immigrant may become a "public charge," noting that the Supreme Court's decision in the *Regents* DACA case

"indicates that application of the *Arlington Heights* framework is appropriate to evaluate whether plaintiffs plead discriminatory animus." __ F. Supp. __, No. 19-CV-04975-PJH, 2020 WL 4440668, at *19 (N.D. Cal. Aug. 3, 2020). The court further noted that *Arlington Heights* "did not address what level of scrutiny—i.e., strict scrutiny, heightened scrutiny, or rational basis—a court should apply to an Equal Protection claim based on racial or ethnic discrimination." *Id.* But the court "would apply a strict scrutiny standard of review" if the plaintiffs "are able to demonstrate racial or ethnic discriminatory purpose to be a motivating factor of the Rule." *Id.* At least three other district courts have similarly applied *Arlington Heights* to claims of racial and national origin discrimination in the immigration context.[5] So the framework of *Arlington Heights* certainly applies to a claim of racial discrimination in a criminal case.[6]

### 3) Six Supreme Court Justices have rejected the government's argument that Congress's intent "must be decided anew with each successive enactment."

In his motion, Mr. Rios-Montano pointed out that two recent Supreme Court decisions held that reenacting a law passed with a discriminatory purpose does not

---

[5] *See Ramos v. Nielsen,* 321 F. Supp. 3d 1083, 1127 (N.D. Cal. 2018) (declining to apply rational basis "rather than traditional strict scrutiny under *Arlington Heights* even where government conduct is motivated by race, color, or ethnicity"); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) (applying *Arlington Heights* to race-based claim); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 324 (D. Md. 2018) (applying *Arlington Heights* rather than rational basis because plaintiffs "contend that the Secretary's decision was infected by discriminatory intent on the basis of race, color, and ethnicity").

[6] The government makes the blanket assertion that "'no [Supreme Court] case . . . has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it.'" Resp. 15 (quoting *Palmer v. Thompson*, 403 U.S. 217, 224 (1971), and citing *United States v. O'Brien*, 391 U.S. 367 (1968)). That is patently incorrect—*Arlington Heights* did, as did *Hunter v. Underwood*, 471 U.S. at 232. Indeed, *Palmer* and *O'Brien* came out six and nine years, respectively, before *Arlington Heights*.

cleanse the law of this purpose. First, the majority in *Ramos v. Louisiana* rejected Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racist intent, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." 140 S. Ct. 1390, 1401 n.44 (2020). Then in *Espinoza v. Montana Dep't of Revenue,* the majority relied on the law's "checkered tradition" of underlying religious discrimination to overturn it, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry." 140 S. Ct. 2246, 2259 (2020). *Id.* at 2259. Concurring, Justice Alito noted that because "I lost, and *Ramos* is now precedent," the Court could examine the law's underlying motives even where legislators had "readopted their rules under different circumstances in later years." *Id.* at 2268 (quotations omitted).

The government brushes off these statements as dicta, claiming that Congress's intent "must be decided anew with each successive enactment." Resp. 11–13. To begin, these statements in *Ramos* and *Espinoza* are not dicta. In the words of Justice Alito, who originally believed that discriminatory intent did *not* survive a law's reenactment, that approach is "now precedent." *Espinoza*, 140 S. Ct. at 2259.

But even if these statements *were* dicta, "lower courts are advised to follow the Supreme Court's considered dicta." *Sonner v. Premier Nutrition Corp.,* 962 F.3d 1072, 1079 n.5 (9th Cir. 2020). In fact, courts must accord it "great weight," *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 683 (9th Cir. 2004), as a "prophecy of what the Court might hold," *Nettles v. Grounds*, 830 F.3d 922, 931 (9th Cir. 2016) (en banc). Here, six Justices either voiced support for considering a law's discriminatory origins following reenactment or recognized that position as the prevailing one. *See Ramos*, 140 S. Ct. at 1392–1420; *Espinoza*, 140 S. Ct. at 2268. On the scale of prophetic dicta, this endorsement during the Court's most recent term rates exceptionally high.

This approach also makes sense. Perhaps if Congress had returned to the proverbial drawing board, grappled with the law's racist origins and effects, and decided it was nonetheless good policy, the government would have a point. But the government offers no reasoned justification why *any* amendment or reenactment—no matter how technical or stylistic—would neutralize all prior legislative history. To the contrary, "[u]nder established canons of statutory construction, it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." *Redmond-Issaquah R.R. Pres. Ass'n v. Surface Transp. Bd.*, 223 F.3d 1057, 1062 (9th Cir. 2000) (quotations omitted).

The government has neither argued nor shown that the 1952 Congress meaningfully reevaluated the illegal entry statute. Absent such evidence, the 1929 law's reenactment with only minor, stylistic changes to the offense definition strongly suggests that that law's purposes and effects endured. "Quite obviously, reenacting precisely the same language would be a strange way to make a change." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 484 (1997).

### 4) Section 1325 "bears more heavily" on Mexican and Latinx people, which is all that is needed to show disparate impact.

Finally, the government denies that illegal entry has disparately impacted Mexican and Latinx defendants. Resp. 9–11. The government does not challenge Mr. Rios-Montano's statistics showing that such defendants have made up the overwhelming majority of people convicted of § 1325. *See* Dkt. No. 70 at 18–19, 21–23. Instead, it argues that this disparate impact is "a product of geography, not discrimination" due to Mexico's proximity to the United States. Resp. 10.

But this argument conflates the *reasons* behind a law with the law's *results*. The government does not dispute that § 1325's impact "'bears more heavily on one race than another.'" *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Under *Arlington Heights*, this is all that is

REPLY TO MOTION TO DISMISS THE SUPERSEDING INDICTMENT BECAUSE § 1325 VIOLATES EQUAL PROTECTION UNDER *ARLINGTON HEIGHTS*

required, since a law violates equal protection if its "original enactment was motivated by a desire to discriminate" and it "continues to this day to have that effect." *Hunter*, 471 U.S. at 233.

In *Hunter*, for instance, the law's challengers showed that Alabama's provision originally "disfranchised approximately ten times as many blacks as whites." *Id.* at 227. The challengers also showed that "[t]his disparate effect persists today" because "blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement." *Id*. This was all that was necessary to show disparate impact. *See id.* at 227–33. The law's challengers did not have to show that white and black people committed the relevant disenfranchising misdemeanors at similar rates or disprove any other reason that the law disproportionately disenfranchised black people.

Here, Mr. Rios-Montano easily clears this minimal disparate impact threshold. As his motion showed, in the years following the 1929 law's passage, Mexicans comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[7] That outsize impact continues today: between 2000 and 2010, Mexicans constituted between 87% and 97% of persons apprehended at the border.[8] So it is irrelevant whether § 1325's present disparate impact is a product of "geography" or "discrimination." All that matters is that it *does* impact Mexican and Latinx communities.

The government's characterization of the DACA decision in *Regents* is further evidence of its confusion. There, the plurality held that disparate impact on

---

[7] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, at 138–39 (2010) (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931–36.
[8] *Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000–2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_0.pdf.

Latinx recipients is *alone* not enough to make up an entire *Arlington Heights* claim, as there was "nothing irregular about the history leading up" to DACA's rescission, and public officials' statements there were "unilluminating" on the question of discriminatory purpose. *Regents,* 140 S. Ct. at 1915–16. This simply reiterates the holding of *Arlington Heights* that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." 429 U.S. at 264–65 (citing *Washington v. Davis,* 426 U.S. 229 (1976)). But it does not undermine the basic premise of *Hunter*: that disparate impact is evaluated by whether a law continues to have the racist effect its *original* enactors intended—not whether its current disparate impact is motivated by a *current* desire to discriminate. *See Hunter*, 471 U.S. at 233.

Furthermore, almost every claim of disparate impact under *Arlington Heights* could be characterized as a "product of geography." For instance, the Ninth Circuit has held that planning decisions made with a racist purpose in predominantly or trending Latinx neighborhoods have disparate impacts on Latinx people. *See The Comm. Concerning Commun. Improvement v. City of Modesto*, 583 F.3d 690, 704–06 (9th Cir. 2009). Educational decisions made with a racist purpose in a predominantly Latinx city have a disparate impact on Latinx students. *See Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015). Voting decisions made with a racist purpose in a state where some American Indian, Latinx, and Black neighborhoods have limited transit and mail access have a disparate impact on those communities. *See D.N.C. v. Hobbs*, 948 F.3d 989, 1004–06 (9th Cir. 2020) (en banc). If the government's "geography not discrimination" theory were correct, these plaintiffs could never have shown a disparate impact, yet the Ninth Circuit held in all these cases that they could.

Finally, the government makes a single attempt to argue that the 1929 illegal entry law was not motivated by racial discrimination, pointing to the fact that

"people born 'in the republic of Mexico' were not subject to the quotas established by the Immigration Act of 1924." Resp. 14.

This is an odd way to engage with the voluminous evidence in Mr. Rios-Montano's motion. That evidence shows that the only thing keeping Congress from setting a quota on Mexicans throughout the 1920s was pressure from agricultural growers, not a lack of racism. *See, e.g.*, Dkt. No. 70, Exhibit A, Hernández declaration, at 3 (stating that pressure from agri-businesses forced nativists in Congress to "choose between accepting a Mexican quota exemption or passing no immigration law at all"); Dkt. No. 70, Exhibit C, Representative Box (TX), "Deportation of Aliens." *Congressional Record*, (Feb. 16, 1929) p. H3619 (legislator complaining that there was no chance of a Mexican quota because too many growers were "interested in the importation of these poor peons").

So the absence of quotas for Mexicans in 1924 was *in spite of* the legislators' discriminatory intent, not due to a lack of it. Indeed, the crime of illegal entry was brokered as a compromise between agricultural growers and nativists in Congress, allowing Congress's racial goals to be fulfilled while avoiding economic harm to growers. And at a minimum, if the government wishes to mount a meaningful claim that § 1325 was *not* fueled by a discriminatory purpose, the place to do so is in an evidentiary hearing.

## CONCLUSION

The government explains that it can be "extremely difficult" to figure out if Congress had a discriminatory motive when passing a facially neutral law. Resp. 15. But it is hard to imagine a legislative record *more* laden with evidence of racism, and a crime with a *greater* impact on one racial group, than illegal entry. And because the government comes nowhere close to showing that Congress would have enacted illegal entry in 1929 in the absence of a discriminatory motive, as

*Arlington Heights* requires, this Court should dismiss the superseding indictment or, at a minimum, schedule an evidentiary hearing.

Respectfully submitted,

Dated: August 26, 2020   *s/ Chloe S. Dillon*
Federal Defenders of San Diego, Inc.
Attorneys for Defendant
BRUNO RIOS-MONTANO
Email: Chloe_Dillon@fd.org