**CHLOE S. DILLON**
California State Bar No. 273748
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Chloe_Dillon@fd.org

Attorneys for Defendant
BRUNO RIOS-MONTANO

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>BRUNO RIOS-MONTANO,<br><br>　　　　　Defendant. | CASE NO.:　19CR2123-GPC<br><br>Hon. Gonzalo P. Curiel<br>Date: December 11, 2020<br>Time: 2:00 p.m.<br><br>**Supplemental Briefing on Legislative History of the Immigration Act of 1990** |

## INTRODUCTION

　　　At a hearing on October 29, 2020, the Court heard oral arguments on Mr. Rios-Montano's motion to dismiss on the basis of equal protection under *Village of Arlington Heights v. Metropolitan Housing Development Corp*, 429 U.S. 252 (1977). Specifically, the Court questioned Mr. Rios-Montano on the impact of the legislative history underlying the Immigration Act of 1990. Because this Act added attempt liability to 8 U.S.C. § 1325 for the first time, the Court questioned why it should look to the legislative history of the original illegal entry law passed in 1929 to determine the existence of a discriminatory intent, rather than the legislative history of the 1990 Act. Mr. Rios-Montano requested the opportunity to brief this issue, which the Court granted.

　　　As explained in Mr. Rios-Montano's original motion, Congress's desire to

criminalize illegal entry in 1929 was fueled by a race-based intent to "protect[] [the] American racial stock from further degradation or change through mongrelization"[1] and keep out "the scoff and scum, the mongrel, the bootlegger element, from Mexico."[2] Nothing in the 1990 legislative history corrects or even acknowledges this intent—in fact, no lawmaker mentions § 1325 at all. Rather, the primary debate in the House of Representatives in 1990 described the Immigration Act of 1990 as "a major comprehensive reform of *legal* immigration." Representative Berman (CA), *Congressional Record* 136: 25 (October 27, 1990) p. H36842 (emphasis added). And while multiple legislators noted the Act's correction of other discriminatory provisions, Congress never recognized or grappled with the racial motives underlying 8 U.S.C. § 1325. Because the minor addition of attempt liability to the crime of illegal entry cannot erase the improper race-based motives embedded in that crime in 1929, the Court should grant Mr. Rios-Montano's motion to dismiss.

**I.  Nothing in the legislative history of the Immigration Act of 1990 corrects—or even acknowledges—the discriminatory intent underlying the crime of illegal entry.**

In 1986, Congress passed the Immigration Reform and Control Act, which focused on controlling unlawful immigration to the United States. Having "closed the back door to illegal immigration" in that Act, legislators could then "open the front door a little wider" to legal migration. Representative Fish (NY) *Cong. Rec.* 136: 25, p. H36838. This led to the Immigration Act of 1990, which "addresse[d] three areas of legal migration: family unification, diversity and employment-based immigration." *Id.* Thus, the primary purpose of this 1990 Act

---

[1] Representative Box (TX). "Restriction of Mexican Immigration," *Congressional Record*, (Feb. 9, 1928) pp. H2817–18.
[2] *Hearings Before the Committee on Immigration and Naturalization*, 69th Cong. 69.1.3 p. 30 (1926) (statement by constituent with which Representative Box and Commissioner General of Immigration agreed).

2                                                                      19CR2123-GPC
REPLY TO MOTION TO DISMISS THE SUPERSEDING INDICTMENT BECAUSE § 1325 VIOLATES EQUAL PROTECTION UNDER *ARLINGTON HEIGHTS*

was to undertake "a major comprehensive reform of *legal* immigration." Representative Berman (CA) *Cong. Rec.* 136: 25, p. H36842 (emphasis added).

The 1990 Act's main purpose was to expand the numbers for family, employment, and diversity immigration to the United States. In addition, Congress "revised" the criminal grounds of deportation through the 1990 Act. *Ledezma-Galicia v. Holder*, 636 F.3d 1059, 1064 (9th Cir. 2010). These substantial revisions to the criminal grounds for deportation, however, only dealt with *civil* immigration law, and the focus of the 1990 Act was legal immigration and civil deportation. Congress made one, minor change to federal *criminal* law in adding attempt liability to the already-existing offense of illegal entry. This change was thus hardly the focus of the 1990 law.

During the primary debate on the Act on October 27, 1990, legislators made reference to the new criminal grounds of deportability in the bill. *See, e.g.,* Representative Smith (TX) *Cong. Rec.* 136: 25, p. H36840; Representative Schumer (NY) *Cong. Rec.* 136: 25, p. H36841; Representative Fish (NY) *Cong. Rec.* 136: 25, p. H36844. But not a single lawmaker ever mentioned § 1325 or the addition of attempt liability. Nor did any legislator acknowledge the well-documented history of racism underlying the original creation of the crime of illegal entry.

On the other hand, legislators repeatedly discussed the discriminatory intent underlying *other* laws that their new bill would correct. As explained in Mr. Rios-Montano's motion, Congress created quotas in the National Origins Act of 1924 that were designed to keep the nation's "racial strains" predominantly Anglo-Saxon.[3] These quotas minimized immigration from southern and eastern Europe and excluded all people of color in an attempt to "stand firm against the efforts of

---

[3] Mae M. Ngai, *Impossible Subjects*, 24–25 (2004 William Chafe, et al.).

'hyphenates' who would 'play politics with the nation's blood stream.'"[4]

Legislators in 1990 repeatedly acknowledged these discriminatory quotas and explained how provisions in the new bill would correct them. Acknowledging the "anti-European bias" in prior laws, multiple representatives declared that the new law "provides fairer immigration standards for nationals from countries like Ireland and Poland." Representative Morella (MD) and Representative Moakley (MA), *Cong. Rec.* 136: 25, p. H36843. *See also* Representative Schumer (NY) *Cong. Rec.* 136: 25, p. H36840 (stating that "there are parts of the world that should be able to contribute to American immigration, places like Ireland and Italy and Poland and Nigeria"); Representative Bryant (TX) *Cong. Rec.* 136: 25, p. H36844 (stating that "this bill serves well the needs of Ireland, Italy, Poland, Nigeria" and "a number of other countries as well"). Lawmakers proclaimed that the new law would correct these "systemic problems" that had "disadvantaged 19th century sending countries" in the past. Representative Morella (MD) *Cong. Rec.* 136: 25, p. H36843.

Legislators also declared the law "a massive reform of the horrible McCarran-Walter immigration legislation" of 1952—a law that had maintained many of the national origin quotas from 1924. Representative Berman (CA) *Cong. Rec.* 136: 25, p. H36842. The 1990 law, lawmakers explained, would eliminate some of the "onerous and discriminatory aspects" of the McCarran-Walter law that had "banned entry to the United States on the basis of homosexuality and ideology." Representative Weiss (NY) *Cong. Rec.* 136: 25, p. H36846. Legislators also described how the 1990 law would do away with some of the "antiquated and unused exclusions that have been in our law since the early 1900's," such as immigration bars based on "illiteracy" and against those who are "paupers, professional beggars, or vagrants." Representative Fish (NY) *Cong.*

---

[4] *Id*. at 35.

*Rec.* 136: 25, p. H36844.

In other words, the legislative history of the Immigration Act of 1990 shows that lawmakers: 1) knew how to identify and acknowledge the discriminatory intent behind certain prior laws; and, 2) had no difficulty acknowledging, discrediting, and correcting those discriminatory laws through new legislation. But, when it came to the specific, racist purpose underlying the crime of illegal entry, legislators entirely failed to recognize or address it. In fact, the modification to § 1325 was so minor that it was *never even mentioned* in the legislative record.

The 1990 Act thus supports Mr. Rios-Montano's argument in several respects. It demonstrates that Congress knows how to recognize, acknowledge, and revise immigration-related laws that had a discriminatory purpose at their enactment. It provides an example of how Congress can reconcile an uncomfortable past with new legislation. And, most importantly, juxtaposed with the utter failure to do so with respect to the criminal law at issue here—the crime of illegal entry always codified since 1929 at 8 U.S.C. § 1325—it demonstrates that Congress failed to act and address the discriminatory past of this law. Unlike other forms of discrimination in civil immigration law that the Immigration Act of 1990 attempted to address, nothing in its legislative history shows that lawmakers were aware of or attempted to correct the discriminatory intent underlying the creation of the crime of illegal entry.

**II. Because lawmakers did not recognize or address the discriminatory intent underlying § 1325, this intent remains embedded in the law.**

Had lawmakers in 1990 addressed the history underlying illegal entry in the same way it addressed other past discriminatory laws, § 1325 could have survived an *Arlington Heights* challenge. All legislators had to do was recognize the impermissible race-based motives underlying the law's 1929 passage and do one of two things. First, they could have repealed illegal entry, as they did with other

"horrible," "onerous," and "discriminatory" laws passed during the same era. Representative Berman (CA) *Cong. Rec.* 136: 25, p. H36842; Representative Weiss (NY) *Cong. Rec.* 136: 25, p. H36846. Second, they could have acknowledged the law's troubling history but cited non-discriminatory reasons for continuing to criminalize illegal entry. But lawmakers did neither. In the absence of such discussion, the Court must conclude that the impermissible motives underlying the law's original passage continue to infect it for the purposes of a constitutional analysis under *Arlington Heights*.

Indeed, this is precisely what *Arlington Heights* requires. Once a discriminatory purpose is shown to be a "motivating factor," the law can only stand upon a showing that it would have passed even without this "impermissible purpose." *Arlington Heights*, 429 U.S. at 270 n.21. But if no evidence exists that Congress would have passed the law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id*. at 225. Because no legislator in 1990 even *mentioned* § 1325—let alone gave reasons why it should exist absent a "discriminatory motivation"—this legislative history cannot cleanse the 1929 law of its racist taint.

As Mr. Rios-Montano explained in his motion and reply, the recent Supreme Court decisions in *Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 (2020), and *Espinoza v. Montana Dep't of Revenue,* 140 S. Ct. 2246, 2259 (2020), support this examination of legislators' original intent in 1929. *See* Dkt. No. 70 at 1–2, 19–20; 73 at 7–8. But even if the government does not like these cases, Supreme Court jurisprudence on this issue stretches back more than a century. In *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, for instance, the Supreme Court explained that a statutory repeal and recodification has no impact on the original intended effect of the substantive provisions because "the new act should be construed as a continuation of the old with the modification contained in the new

REPLY TO MOTION TO DISMISS THE SUPERSEDING INDICTMENT BECAUSE § 1325 VIOLATES EQUAL PROTECTION UNDER *ARLINGTON HEIGHTS*

act." 164 U.S. 1, 11–12 (1896). *See also Pac. Mail S.S. Co. v. Joliffe*, 69 U.S. 450, 458 (1864) ("The new act took effect simultaneously with the repeal of the first act; its provisions may, therefore, more properly be said to be substituted in the place of, and to continue in force with modifications, the provisions of the original act, rather than to have abrogated and annulled them")). Ninety years later, in *Oneida County v. Oneida Indian, Nation of New York State*, the Supreme Court articulated the same standard, citing the same cases, when interpreting the federal Nonintercourse Act. 470 U.S. 226, 246 & n.18 (1985). The upshot of these decisions is that, "when an existing statute is reenacted by a later statute in substantially the same terms," the "unchanged provisions which are repeated in the new enactment are construed to have been continuously in force." 1A.N. Singer & J. Singer, *Statutes and Statutory Construction* (7th ed. 2009) § 23:29.

Requiring legislative bodies to reevaluate prior laws that were enacted with a discriminatory intent does not permanently render a particular area of law unconstitutional or prevent Congress from legislating on a particular subject. Rather, it prevents the unlawful vestiges of the past from moving silently into the present through inertia and the passage of time. As the Supreme Court has explained, "a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior de jure dual system that continue to foster segregation." *United States v. Fordice*, 505 U.S. 717, 728 (1992).

Here, nothing in the 1990 legislative history "eradicates policies and practices traceable" to the original discriminatory intent underlying the 1929 law. In fact, nothing in the 1990 legislative history even mentions this racially-motivated history—even though legislators were willing to acknowledge and correct other discriminatory laws passed during the same era. Because the 1990 legislative history does not show that Congress would have created the crime of

illegal entry in 1929 without this "impermissible purpose," *Arlington Heights*, 429 U.S. at 270 n.21, § 1325 is unconstitutional.

### III. In any case, attempted illegal entry does not exist independent of the substantive offense.

As Mr. Rios-Montano explained above, the addition of attempt liability to the substantive offense of illegal entry was a minor alteration in the Immigration Act of 1990—so inconsequential that it appears *nowhere* in the legislative history. Because the legislature failed to correct or address the discriminatory intent underlying § 1325, the same intent thus infects attempted illegal entry and renders it unconstitutional under the same equal protection challenge.

But even if this were not true, Mr. Rios-Montano's challenge would still succeed for a separate and independent reason. As Mr. Rios-Montano explained in his Reply, "[t]he crime of attempt does not exist in the abstract, but rather exists only in relation to other offenses." Wayne R. LaFave, *Intent to commit a crime*, 2 Subst. Crim. L. § 11.3(a) (3d ed.). Indeed, Justice Scalia has stated that "attempt . . . is a parasitic crime. There is no such crime as bald attempt; it must be attempt *to commit some other crime.*" *United States v. Resendiz-Ponce*, 549 U.S. 102, 115 (2007) (Scalia, J., dissenting) (emphasis original). For this reason, the Court should resist the government's efforts to put a venire over the crime of illegal entry with attempt liability. Attempted illegal entry does not exist without the substantive crime of illegal entry, and if the substantive crime of illegal entry is unconstitutional so is any attempt.

And, at a minimum, Mr. Rios-Montano has shown that the substantive offense of illegal entry was enacted in 1929 with a clear, discriminatory purpose and that it has disparately impacted Mexican and other Latinx defendants. *See* Dkt. No. 70, 73. If the government cannot show that Congress would have passed this law in 1929 without this intent, the substantive offense of illegal entry is unconstitutional. Without the anchor of this substantive offense, attempted illegal

entry cannot "exist in the abstract." Wayne R. LaFave, *Intent to commit a crime*, 2 Subst. Crim. L. § 11.3(a) (3d ed.). If illegal entry falls, the "parasitic crime" of attempted illegal entry falls with it. *Resendiz-Ponce*, 549 U.S. at 115 (Scalia, J., dissenting).

## CONCLUSION

Not a single legislator mentioned § 1325 during the debate on the Immigration Act of 1990. Had lawmakers acknowledged and purported to correct the discriminatory intent underlying this law—as they did with other provisions in the bill—§ 1325 would be constitutional. Had lawmakers confronted the discriminatory history but cited other reasons for criminalizing illegal entry, § 1325 would be constitutional. But Congress did neither. Because this legislative history affirms that the discriminatory intent embedded in the original version of illegal entry has never been confronted, § 1325 violates equal protection under *Arlington Heights*.

Respectfully submitted,

Dated: November 12, 2020

*s/ Chloe S. Dillon*
Federal Defenders of San Diego, Inc.
Attorneys for Defendant
BRUNO RIOS-MONTANO
Email: Chloe_Dillon@fd.org