UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRUNO RIOS-MONTANO,<br><br>Defendant. | Case No.: 19-CR-2123-GPC<br><br>**ORDER DENYING MOTION TO DISMISS INDICTMENT UNDER THE EQUAL PROTECTION CLAUSE**<br><br>**[ECF No. 70.]** |
|---|---|

Pending before the Court is Defendant Bruno Rios-Montano's motion to dismiss the Superseding Indictment on the basis that 8 U.S.C. § 1325 violates the equal protection component of the Fifth Amendment due process clause under the test set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). ECF No. 70.  For the reasons that follow, the Court DENIES the motion to dismiss.

## I.   Procedural History

On September 24, 2019, the Government filed the Superseding Indictment which charges that Mr. Rios-Montano, being an alien, knowingly and intentionally attempted to enter the United States with the purpose of entering the United States at a time and place other than as designated by immigration officers in violation of 8 U.S.C. § 1325(a)(1).

ECF No. 29.  On August 5, 2020, Mr. Rios-Montano filed a motion to dismiss the Superseding Indictment against him.  ECF No. 70.  Mr. Rios-Montano asserts that Section 1325 is unconstitutional under *Arlington Heights*, 429 U.S. 252 (1977), because the illegal entry statute was enacted with a discriminatory purpose and has a disparate impact against Mexicans and other Latinx individuals in violation of the equal protection component of the Fifth Amendment.  *Id*.  The motion to dismiss also requested that, in the event that the Government submitted evidence to rebut Mr. Rios-Montano's evidence of discriminatory intent and disparate impact, the Court hold an evidentiary hearing to hear evidence on the *Arlington Heights* factors.  *Id.* at 24.  On August 13, 2020, the Government filed a response in opposition.  ECF No. 71.  On August 26, 2020, Mr. Rios-Montano filed a reply.  ECF No. 73.  On September 24, the Court held a telephonic status hearing and requested further briefing on the evidentiary issues.  ECF No. 74.  Following supplemental briefing, the Court determined an evidentiary hearing was not needed.  ECF Nos. 75, 76, 78.

On October 29, 2020, the Court held a hearing on the motion to dismiss.  ECF No. 79.  Following the hearing, the Court permitted Mr. Rios-Montano to submit further briefing on the legislative history of Section 1325.  *Id.*  On November 12, 2020, Mr. Rios-Montano filed additional briefing on the legislative history.  ECF No. 80.  On November 25, 2020, the Government filed a response.  ECF No. 81.  Having considered the briefing and argument of counsel, the Court concludes that 8 U.S.C. § 1325 was not enacted in 1990 with a discriminatory purpose and does not violate equal protection. While the precursor illegal entry statute enacted in 1929 was enacted with discriminatory intent, the taint from the 1929 statute had dissipated by 1990 and there is no evidence that the 1990 Congress entertained any discriminatory purpose.

/ / /

/ / /

## II. Analysis

### A. *Arlington Heights* applies to Section 1325.

The Court first must determine whether the discriminatory intent test outlined in *Arlington Heights* applies to a criminal immigration law such as Section 1325. "[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954). An equal protection violation need not appear on the face of the statute; rather, a litigant may show the challenged law was enacted with "an invidious discriminatory purpose [which] may often be inferred from the totality of the relevant facts." *Id.* at 241–42. In *Arlington Heights*, the Supreme Court articulated a non-exhaustive list of factors that courts should look to in order to determine whether a discriminatory purpose was a motivating factor for a governmental decision, noting that such analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 265–68. Absent proof of a discriminatory purpose, courts apply a rational basis standard of review. *See id.* at 265–66; *United States v. Dumas*, 64 F.3d 1427, 1430–31 (9th Cir. 1995) (applying rational basis upon finding no discriminatory motivation for statute). But if a discriminatory purpose is found to be a motivating factor for the government's decision, a court must apply strict scrutiny, as it would to a law involving a facial classification on the basis of race. *See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999).

The Government contends that Section 1325 cannot be found unconstitutional under the *Arlington Heights* standard of review because Congressional decisions relating to immigration affairs are subject to the limited standard of review outlined in *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972), or, at most, the rational basis standard of review. Mr. Rios-Montano responds that Congress's plenary power over immigration does not

prevent the Court from considering whether Section 1325 was enacted with racially discriminatory animus in violation of the Fifth Amendment's equal protection component.

As a preliminary matter, the Court notes that all criminal defendants are entitled to the Constitutional guarantee of due process of law secured by the Fifth Amendment, regardless of immigration status. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[E]ven aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."); *United States v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987) (noting that Section 1326 must "comport with the constitutional requirement of due process"). Further, the federal government's plenary power over immigration matters does not provide it license to enact racially discriminatory statutes in violation of the equal protection guarantee of the Fifth Amendment. The Ninth Circuit, as well as a plurality of the Supreme Court, recently declined to apply the highly deferential standard of review advocated by the Government to an equal protection challenge of immigration decisions by the executive. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020); *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020) (hereinafter *Wolf*). In *Ramos v. Wolf* and the Ninth Circuit decision in *Regents*, the Ninth Circuit applied *Arlington Heights* rather than a more deferential standard of review to an equal protection challenge of the executive branch's repeal of immigration enforcement policies, given considerations that included "the physical location of the plaintiffs within the geographic United States, the lack of a national security justification for the challenged government action, and the nature of the constitutional claim raised." *Wolf*, 975 F.3d at 896 (quoting *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 520 (9th Cir. 2018), *rev'd in part, vacated in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891

(2020)). The Supreme Court plurality opinion in *Regents* likewise applied the *Arlington Heights* framework to the repeal of the Deferred Action for Childhood Arrivals ("DACA") program by the Acting Secretary of the Department of Homeland Security,[1] as did Justice Sotomayor's concurring opinion. *Regents*, 140 S.Ct. at 1916; *id.* at 1918 (Sotomayor, J., concurring). The fact that Mr. Rios-Montano challenges a criminal law, rather than a policy dictating immigration privileges, further confirms that his equal protection challenge is reviewable under more than the limited standards offered by the Government.

That previous decisions have applied *Arlington Heights* to executive immigration decisions, rather than Congressional ones, is of no consequence. The Government has provided no convincing justification for why the President, in executing the immigration laws enacted by Congress through administrative action, would be subject to Constitutional equal protection constraints that Congress is free to ignore. Further, it would be inconceivable—and without basis in law—to find that courts are unable to review a criminal law that, on its face, targets a particular racial group merely because the offense relates to immigration—for example, if Section 1325 explicitly prescribed harsher penalties for immigrants of Latin American descent. The Supreme Court has clearly stated that both facially discriminatory laws and facially neutral laws enacted with discriminatory animus may violate equal protection. *E.g.*, *Washington*, 426 U.S. at 241. A criminal immigration statute passed by Congress is not insulated from scrutiny because the defendant seeks to prove the equal protection violation through a racially discriminatory Congressional motive rather than a facial classification on the basis of race. Accordingly, the Court finds that Section 1325 must be reviewed under the

---

[1] The plurality did not determine the merit of the Government's argument that the more deferential standard applicable to claims of selective enforcement in deportation proceedings should apply to the Court's review of DACA, an issue not present here. *Regents*, 140 S.Ct. at 1916.

*Arlington Heights* framework to determine whether it denies Mr. Rios-Montano equal protection of the laws.

### B. Mr. Rios-Montano has not met his burden under *Arlington Heights*.

1. *The Court must consider the Congressional motivation underlying the enactment of Section 1325, the statute which Mr. Rios-Montano is charged with violating.*

Having determined that Mr. Rios-Montano is entitled to challenge the Superseding Indictment under *Arlington Heights*, the Court must turn to the task of discerning Congressional intent. *Arlington Heights* states that the "sensitive inquiry" of "[d]etermining whether invidious discriminatory purpose was a motivating factor" for the legislative enactment requires looking to the disparate impact of the official action, "[t]he historical background of the decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence" "[s]ubstantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and "[t]he legislative or administrative history . . . , especially when there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 266−68. The threshold question for this Court, however, is which Congress's intent is subject to review. Mr. Rios-Montano argues that the Court should look to the initial enactment of the statute criminalizing unlawful entry, which occurred in 1929. The Government contends that the Court must look to the provision Mr. Rios-Montano is actually charged with violating−Section 1325(a)(1), enacted in its current form in 1990.

In 1929, Congress enacted the Undesirable Aliens Act, which provided that "[a]ny alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials . . .

6

shall be guilty of a misdemeanor." Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2. The Immigration and Nationality Act of 1952, the first comprehensive immigration law, recodified existing provisions under title 8 of the U.S. Code and continued to criminalize unlawful entry. Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 275, 66 Stat. 229. Section 1325 was enacted in its current form in the Immigration Act of 1990, criminalizing attempted unlawful entry in addition to unlawful entry. Immigration Act of 1990, Pub. L. No. 101-649, § 543(b)(2), 104 Stat. 5059 (codified as amended 8 U.S.C. §1325(a)(1)).

*Arlington Heights* permits consideration of historical circumstances. Mr. Rios-Montano has presented legislative history for the 1929 law and the declaration of a historian, Dr. Kelly Lytle Hernandez, supporting his contention that members of the 1929 Congress sought to criminalize unlawful entry, at least in part, because of their endorsement of eugenics and opposition to the "Mexican race". ECF No. 70 at 7–18; ECF No. 70-1, Ex. A-L. This information is certainly relevant to the Court's consideration of the historical backdrop against which Section 1325 was adopted. *Cf. Rogers v. Lodge*, 458 U.S. 613, 624–25 (1982) (considering past laws intended to disenfranchise black people as evidence of intent that at-large election system was adopted with a discriminatory purpose); *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1039 (9th Cir. 2020) (looking to legislature's "long history of race-based discrimination, disenfranchisement, and voter suppression" in determining law passed in 2016 was motivated by a discriminatory purpose). However, *Arlington Heights* directs the Court to look at the motivation behind the official action being challenged. *See Arlington Heights*, 429 U.S. at 265–67 (describing intent analysis in terms of "the challenged decision"). The challenged decision in this case is the decision to criminalize

the conduct Mr. Rios-Montano is charged with committing—attempting unlawful entry.[2] This means that the Court must seek to discern the intent of the Congress that enacted that provision of Section 1325, rather than the intent of previous Congresses.

Mr. Rios-Montano's reliance on *Ramos v. Louisiana* and *Espinoza v. Montana Department of Revenue* is unavailing. These cases certainly support the contention that subsequent enactments of a statute do not erase its historical context. But *Ramos* and *Espinoza*, neither of which involved an equal protection challenge, did not hold that the discriminatory motivations of a previous legislature are determinative of the outcome of an *Arlington Heights* analysis of a law enacted by a subsequent legislature. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 (2020); *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020). Crucially, despite the well-documented discriminatory history of the provisions at issue in both cases, neither *Ramos* nor *Espinoza* found that the currently operative provisions had been enacted with discriminatory intent, as is required to find an equal protection violation under *Arlington Heights*. *See Ramos*, 140 S. Ct. at 1401 n.44 (noting dissent's argument that "Louisiana and Oregon eventually recodified their nonunanimous jury laws in new proceedings untainted by racism," and disagreeing with the import, but not the accuracy, of that claim); *Espinoza*, 140 S. Ct. at 2259 (noting, and not questioning, Montana's argument that it re-adopted the no-aid provision in the 1970s "for reasons unrelated to anti-Catholic bigotry"). Rather, these decisions confirm

---

[2] Although Mr. Rios-Montano points out that the crime of attempt does not exist independent of the substantive offense of unlawful entry, under settled Ninth Circuit law, prior to the Immigration Act of 1990, he could not have been charged with attempted unlawful entry. *See United States v. Chi Tong Kuok*, 671 F.3d 931, 941 (9th Cir. 2012) (quoting *United States v. Hopkins*, 703 F.2d 1102, 1104 (9th Cir. 1983)) ("[T]here is no general federal 'attempt' statute. A defendant therefore can only be found guilty of an attempt to commit a federal offense if the statute defining the offense also expressly proscribes an attempt.")). It is therefore the 1990 law that gives rise to Mr. Rios-Montano's asserted constitutional injury in this case. Even if the Court treated unlawful entry as the relevant statutory provision, Section 1325 has been recodified several times since 1929, and Mr. Rios-Montano has not submitted evidence showing the intent of these later Congresses.

that the historical context of legislative enactments are relevant, a point already reflected in the *Arlington Heights* framework.

In some situations, the legislative history of past enactments may be highly probative of the motivations of the legislators who enacted the current law, but the Court cannot automatically impute these past motivations to the current law and forgo analysis of the enacting legislature required by *Arlington Heights*. *Cf. Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) ("[W]e have never suggested that past discrimination flips the evidentiary burden [of the intent test] on its head."). The Court therefore must consider whether Mr. Rios-Montano has shown that Congress's 1990 enactment of Section 1325 was motivated at least in part by a discriminatory purpose.

2. *Mr. Rios-Montano has not shown Section 1325 was enacted with a racially discriminatory purpose.*

The Court will address the *Arlington Heights* factors in turn to determine whether Mr. Rios-Montano has shown that "invidious discriminatory purpose was a motivating factor" in the enactment of the current Section 1325. *Arlington Heights*, 429 U.S. at 266.

    **a.**     **Historical background**

In his initial motion to dismiss, Mr. Rios-Montano describes at length the historical background of the 1929 Undesirable Aliens Act, the precursor for today's provision criminalizing unlawful entry. He points to comments made on the floor of Congress that show several legislators who were involved in the passage of the 1929 Act viewed it as a means of fighting against the "hordes" of Mexicans, as well as to the endorsement of eugenics among some legislators in the context of the broader immigration debate. ECF No. 70-1, Ex. A ("Hernandez Decl.") at 5–7, 9; Ex. B (*Eugenical Aspects of Deportation: Hearing No. 70.1.4 Before the H. Comm. on Immigration and Naturalization*, 70th Cong. (1928) (statement of Harry H. Laughlin)); Ex. C (70 Cong. Rec. 3614 (Feb. 16, 1929)). Some legislators unabashedly endorsed white supremacy and directly tied the goal of

preventing long-term immigration of Mexicans to racial panic. ECF No. 70 at 12–13; ECF No. 70-1, Ex. C (70 Cong. Rec. 3614 (Feb. 16, 1929)); Ex. F (69 Cong. Rec. 2462 (1928)); Ex. G (*Deportation: Hearing on Proposed Deportation Act of 1926 Before the H. Comm. on Immigration and Naturalization*, 69th Cong. (1926) (statements of Hon. Robe Carl White, Hon. Harry E. Hull, W. H. Wagner)). This history suggests that at least some members of Congress were motivated to support immigration restrictions at least in part out of a desire to maintain the supposed purity of the white race and prevent racial mixing, and intended the laws to target races they deemed undesirable. The fact that countries in the Western Hemisphere were not subject to numerical quotas at the time, which Dr. Lytle Hernandez explains was related to pressure from agribusiness interests that relied on short-term Mexican labor, does not negate the significant historical record reflecting racial animus. Hernandez Decl. at 7. As the intent test recognizes, the fact that race was not the singular focus of lawmakers does not mean they had no impermissible motive at all. *Cf. Arlington Heights*, 429 U.S. at 255 ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern."). The racially discriminatory motives of the legislators who advocated for the original unlawful entry law, which is substantially similar to the provision in force today, as well as the blatant racism that characterized the immigration debate of the early twentieth century more generally, is relevant to the Court's determination of whether the 101st Congress adopted the current Section 1325 with a similarly impermissible intent. However, because this historical background is remote in time to the Immigration Act of 1990, its probative value as to the motivations of the 101st Congress is limited. *See City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion).

\ \ \

\ \ \

### b. Relevant legislative history, sequence of events leading to enactment, and departures from normal practice of decisionmaking

Mr. Rios-Montano points to the absence of legislative history relating to Section 1325's alterations in the 1990 Act as evidence that members of the 101st Congress did not recognize or address the provision's racially motivated past, and therefore that the racially discriminatory intent of the 70th Congress remains embedded in the current version of Section 1325.  ECF No. 80 at 5.  Mr. Rios-Montano reasons that because the legislative history indicates that the 101st Congress grappled with and corrected other discriminatory provisions in the immigration law, Congress was able to "reconcile an uncomfortable past with new legislation" but did not do so with respect to Section 1325. *Id.*  The Government maintains its position that the legislative history evinces no discriminatory motive on the part of the 101st Congress.  ECF No. 81 at 2–3.

The crux of the *Arlington Heights* intent test is to discern the motive of the government officials that engaged in the challenged action, yet Mr. Rios-Montano has failed to provide any legislative history or other evidence suggestive of the motives of the 101st Congress to support Mr. Rios-Montano's burden to show a discriminatory motive. Given this failure, Mr. Rios-Montano is left with the assertion that in 1990, the "legislators entirely failed to recognize" the "racist purpose" of the 1929 statute.  ECF No. 80 at 5.  While not specifically referencing the 1929 law or condemning white supremacy or eugenics, the legislative history for the 1990 legislation reveals a 180-degree turn away from the racist tropes that accompanied the enactment of the 1929 immigration law.  Ultimately, the question before the Court is whether a law related to one that was stained by white supremacy can ever be cleansed without a formal condemnation of the earlier law. The answer is it depends on the surrounding circumstances, including the passage of time, the pronouncements made with respect to the new law and the nature and purpose of the law.

In considering the conference report on the Immigration Act of 1990, Congressman Bruce Morrison, chairman of the of the House Immigration Subcommittee and House author of the Immigration Act of 1990, described the legislation as historic legislation that "reforms our legal immigration system in ways more extensive and more broad than any legislation this Congress has ever considered before." 136 Cong. Rec. 36839 (Oct. 27, 1990).  Congressman Morrison observed that the law was strong on the improvement of family unification and brought families together.  *Id.*  He also observed that under the legislation those who fled the violence and death in El Salvador would be given temporary protected status.  *Id.*  Congresswoman Nancy Pelosi expressed her support for the legislation, describing herself as one who believes that immigration is good for our country.  136 Cong. Rec. 36843–44.

At the same time, as to the exclusion of undocumented individuals, Congressman Hamilton Fish IV emphasized that the changes the legislation brought about would:

> "not disturb the basic reasons for which we have always, and will always, exclude aliens:  For cases where aliens have criminal records, when they are public health risks, when they violate drug laws, when they are likely to become economic burdens on the country, or *when they have previously violated U.S. Immigration laws*. This is a comprehensive reform of exclusions laws which is a rational accommodation of the concerns of everyone—from those of the administration to those of civil libertarians." 136 Cong. Rec. 36844 (emphasis added).

The legislation enjoyed the support of Congressmen Kika de la Garza, Bill Richardson, Edward Roybal and Esteban Torres whose statements recognize the importance of immigration and diversity in the United States.  136 Cong. Rec. 36845–46. Further, although not dispositive, the fact that organizations such as the Mexican American Legal Defense and Education Fund (MALDEF) and the American Civil Liberties Union (ACLU) supported the law further weakens Mr. Rios-Montano's argument that congressional silence on the changes to Section 1325 should be construed as evidence of an impermissible motive.  136 Cong. Rec. 36846–47.

1    According to Mr. Rios-Montano the change in law that created the offense of
2 attempted illegal entry was "hardly the focus of the 1990 law" and there is no specific
3 reference in the legislative history to § 1325 as to establish an endorsement of the law.
4 Although Mr. Rios-Montano argues that the intent of the prior Congress remains legally
5 operative until a future Congress makes an affirmative contrary showing, other courts
6 that have considered the issue in the context of felon disenfranchisement provisions have
7 rejected this approach.  In *Johnson v. Governor of the State of Florida*, the Eleventh
8 Circuit found that Florida's 1968 re-enactment of a disenfranchisement provision
9 originally adopted in 1868 "eliminated any taint from the allegedly discriminatory 1868
10 provision." 405 F.3d 1214, 1223 (11th Cir. 2005).  In so finding, the court emphasized
11 the lengthy deliberative process preceding the 1968 enactment, during which there was
12 no allegation of racial animus.  *Id.*  Likewise, the Fifth Circuit in *Cotton v. Fordice*
13 rejected the argument that a disenfranchisement provision could be invalidated solely on
14 the basis that the original version of the provision was adopted with a discriminatory
15 purpose, where the provision's challenger "offered no such proof regarding the current
16 version." 157 F.3d 388, 392 (5th Cir. 1998).  The Second Circuit agreed in *Hayden v.*
17 *Paterson*, finding that because there had been "substantive amendment to New York's
18 constitutional provision" and because of "the lack of any allegations by plaintiffs of
19 discriminatory intent reasonably contemporaneous with the challenged decision,"
20 plaintiffs failed to state a plausible claim of discrimination with respect to the amended
21 provision.  594 F.3d 150, 166–67 (2d Cir. 2010).  Like the challengers to the amended
22 disenfranchisement provisions at issue in these cases, Mr. Rios-Montano would have the
23 lack of Congressional disavowal of the discriminatory purposes of the previous version
24 render the current version unconstitutional.  However, the thorough deliberative process
25 Congress undertook in 1990, combined with the lack of legislative history addressing
26 Section 1325, underscores the absence of proof of the 101st Congress's discriminatory

intent.[3]

While Mr. Rios-Montano has not cited any part of the legislative history which discloses any racial animus in the law against aliens from Latin America, a review of the legislative history reveals a balancing of valid immigration considerations such as reunifying families, providing support of Central Americans displaced by violence, protecting jobs for those legally in the United States and protecting the safety and health of the community.  The Court concludes that the legislative history for the 1990 legislation does not reveal any discriminatory motive and provides no support for Mr. Rios-Montano's position.

### c.   Disparate impact

Although a showing of disparate impact on its own is typically insufficient to show an equal protection violation, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Davis*, 426 U.S. at 242.  Mr. Rios-Montano contends that Mexicans and other Latin Americans make up the vast majority of individuals apprehended at the border and that Mexicans historically accounted for upwards of 84 percent of unlawful entry convictions, which supports a finding that Section 1325 bears more heavily on Latinx people.  ECF No. 70 at 18–19, 21.  The Government does not dispute the statistics cited by Mr. Rios-Montano, but argues they are due solely to Mexico's geographic proximity to the United States and that Mr. Rios-

---

[3] The *Hayden* court also addressed the concern that "a legislative body might seek to insulate from challenge a law known to have been originally enacted with a discriminatory purpose by (quietly) reenacting it without significant change," but found that the case at issue did not present such a concern. *Hayden*, 594 F.3d at 167.  Similarly, Mr. Rios-Montano has not argued that the 1990 legislature had such a purpose in mind; instead, he suggests that Congress did not "recognize or address" the provision's racist past.  ECF No. 80 at 5.

Montano therefore cannot show disparate impact. ECF No. 71 at 14.[4]

Although the Government's observation that immigration laws will almost always disproportionately affect Mexican and Latin American defendants is accurate, it does not answer the threshold question of whether the challenged law "bears more heavily on one race than another." *Davis*, 426 U.S. at 242. The Government's interpretation of disparate impact would seem to require a party challenging a law under the *Arlington Heights* intent test to show not only that a law had a discriminatory purpose, but also that it was not neutrally applied. But an official action taken with a discriminatory purpose that disproportionately affects the disfavored group accomplishes the invidious motive, even if those tasked with its enforcement do not take the further step of selectively enforcing the law or policy against the disfavored group. In *Arlington Heights* itself, the Court found that the zoning restriction limiting the building of low-cost housing may have disparately impacted African Americans, even though that disparate impact was due to African Americans being disproportionately represented among those eligible for low-cost housing, much like the disparate impact here is due to Latinx people being disproportionately represented among those apprehended at the border.[5] *See Arlington Heights*, 429 U.S. at 270; *cf. Dumas*, 64 F.3d at 1429 (accepting fact that "the heavy penalties for crack-related offenses disproportionately affect Blacks because Blacks are

---

[4] Mr. Rios-Montano also points to the current administration policy of wielding § 1325 as a tool of mass prosecution in support of its disparate impact position. ECF No. 70 at 22–23. While the executive department's current immigration policies appear to echo the racist tone and objectives of the 1929 Congress, they are not salient in determining whether the 1990 legislation was affected by a discriminatory motive.

[5] *Ramos v. Wolf*, which found that the revocation of Temporary Protected Status ("TPS") did not "bear more heavily" on one racial group than another, presents a somewhat different issue. *Wolf*, 975 F.3d at 898. Because individuals from Latin American countries were the primary beneficiaries of TPS designations, the revocation of virtually any TPS designation would disproportionately affect individuals from Latin America, which the Ninth Circuit found not to be probative of discriminatory intent under *Arlington Heights*. *Id.*

15

more likely to possess crack than Whites" as evidence of disparate impact).  The plurality in *Regents* merely restated the settled principle that disparate impact alone, absent other evidence of discriminatory motive, is insufficient to state a claim under *Arlington Heights*.  *Regents*, 140 S. Ct. at 1915–16.  It is true that immigration policies will frequently have a disproportionate impact on a particular racial group.  But because these policies will often be "plausibly explained on a neutral ground," *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 275 (1979), the intent test requires additional evidence of an insidious motive before finding the law unconstitutional.  *See Davis*, 426 U.S. at 242 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.").

Accordingly, although Latinx people are likely disproportionately affected by Section 1325, the disparate impact alone in this case is not stark enough to show discriminatory motive, given that the disparity is explainable on grounds other than race. *See Arlington Heights*, 429 U.S. at 266.  The Court therefore finds that Mr. Rios-Montano has not met his burden of showing that Congress acted with a racially discriminatory motive in enacting Section 1325.

**III.  Conclusion**

For the foregoing reasons, Defendant's motion to dismiss the Superseding Indictment under *Arlington Heights* is **DENIED**.

**IT IS SO ORDERED.**

Dated:  December 7, 2020

Hon. Gonzalo P. Curiel
United States District Judge